Filed:  February 11, 1997

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

—————————

Nos. 95-2882(L)
(CA-93-771-H)

—————————

Erin Kathleen Jones, et al,

Plaintiffs - Appellants,

versus

George W. Wellham, III, et al,

Defendants - Appellees.

—————————

O R D E R

—————————

The Court amends its opinion filed January 14, 1997, as follows:

On page 2, section 5, line 3 -- the title for John F. Breads is corrected to read "Senior Assistant County Attorney."

On page 2, section 5, line 8 -- the County Attorney's name is corrected to read "Phillip F. Scheibe."

On page 8, first full paragraph, line 5 -- "includes" is corrected to read "include."

On page 11, second full paragraph, line 4 -- the "state District Attorney's Office" is corrected to read "the State's Attorney's Office.

On page 11, second full paragraph, line 6 -- the phrase "District Attorney" is corrected to read "State's Attorney."

On page 13, second full paragraph, line 4 -- the citation is corrected to read "Shaw v. Stroud."

For the Court - By Direction

/s/ Patricia S. Connor
_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ERIN KATHLEEN JONES,
<u>Plaintiff-Appellant,</u>

v.

GEORGE W. WELLHAM, III; ANNE
ARUNDEL COUNTY; MAXWELL V.
FRYE, JR.; WILLIAM S. LINDSEY,

                No. 95-2882

<u>Defendants-Appellees,</u>

and

MICHAEL DENNIS ZIEGLER; PRESENTLY
UNKNOWN AND UNDETERMINED
SUPERVISORY POLICE OFFICERS,
<u>Defendants.</u>

ERIN KATHLEEN JONES,
<u>Plaintiff-Appellee,</u>

v.

MICHAEL DENNIS ZIEGLER,
<u>Defendant-Appellant,</u>

and

                No. 95-2966

GEORGE W. WELLHAM, III; ANNE
ARUNDEL COUNTY; MAXWELL V.
FRYE, JR.; WILLIAM S. LINDSEY;
PRESENTLY UNKNOWN AND UNDETERMINED
SUPERVISORY POLICE OFFICERS,
<u>Defendants.</u>

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Alexander Harvey II, Senior District Judge.
(CA-93-771-H)

Argued: September 26, 1996

Decided: January 14, 1997

Before MURNAGHAN and ERVIN, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by published opinion. Senior Judge Phillips wrote the opinion, in which Judge Murnaghan and Judge Ervin joined.

_____

**COUNSEL**

**ARGUED:** William Francis Gately, HOWELL, GATELY, WHITNEY & CARTER, Towson, Maryland, for Appellant. John Francis Breads, Jr., Senior Assistant County Attorney, OFFICE OF LAW, Annapolis, Maryland; Robert Charles Verderaime, VERDERAIME & DUBOIS, P.A., Baltimore, Maryland, for Appellees. **ON BRIEF:** H. Thomas Howell, Kathleen D. Leslie, HOWELL, GATELY, WHITNEY & CARTER, Towson, Maryland, for Appellant. Phillip F. Scheibe, County Attorney, OFFICE OF LAW, Annapolis, Maryland; Ronald A. Silkworth, Glen Burnie, Maryland, for Appellees.

_____

**OPINION**

PHILLIPS, Senior Circuit Judge:

Claiming that she was raped in 1990 by then-Anne Arundel County police officer Michael Ziegler, Erin Jones brought various § 1983 and state law claims against Ziegler, the County, and George Wellham, then County Police chief, in Maryland state court. Following removal

2

of the action, the claims against Ziegler were first tried on the merits to a jury which found for Jones, awarding her substantial compensatory and punitive damages. Ms. Jones then added federal and state claims against former Police Chiefs Maxwell Frye and William Lindsey, following which the County and the three Police chief-defendants moved for, and were granted, summary judgment as to all claims against them. We affirm both on Jones' appeal from the grant of summary judgment against her and on Ziegler's appeal from the judgment entered against him on the jury verdict.

I.

In the early morning of November 15, 1990, Officer Ziegler stopped a pickup truck driven by Ms. Jones, then age 23, on ostensible suspicion of driving while intoxicated. After questioning and observing Jones, Ziegler asked her to get into his police cruiser, told her that he would not arrest her, and said that he would drive her home. He did not, instead driving past the turnoff to her house and into a church parking lot. When Jones questioned him as to why he had gone past her house, Ziegler explained that he had to check something at the church.

Ziegler got out of the car at the church, and removed some of his clothing. According to Jones, when he returned to the car, he forcibly removed Jones' underwear and then forced her to have sex with him. According to Ziegler, Jones removed her underwear and willingly had sex with him. Ziegler then drove Jones home and dropped her off.

Once home, Jones called 911 to report the rape, but hung up after saying very little. The 911 operator traced her call and sent police units to her address; when they arrived, she explained that she had been raped by a uniformed officer. The police took her to the hospital for treatment and a medical examination.

As a result of Jones' report to the police, Ziegler's police powers were immediately suspended, and he was ordered to surrender his weapon and badge. After an investigation the state's attorney charged him with second-degree rape, but he eventually pleaded to the lesser charge of misconduct in office, for which he received a one-year sus-

3

pended sentence and five years' probation. He also agreed to resign from the police force.

The incident with Jones was not the first time Ziegler had been involved in sex-related conduct with a citizen while on duty. In 1979 he had used his badge to gain entrance to a woman's apartment in the middle of the night, asking to use her telephone. The woman, Brenda Forsythe, later told the police that Ziegler removed his shirt and asked her if she could help him by getting a blood stain out of it. Ziegler then sat on the sofa, took off his shoes and gunbelt, and when Forsythe came near the sofa, Ziegler began fondling her. When, as she claimed, she resisted, Ziegler responded that if she did not have sex with him, he would have her arrested for prostitution. According to Forsythe, Ziegler then followed her to her bedroom, where he disrobed, tried to force her to perform oral sex on him, and, when she refused, raped her. After he dressed and used one of Forsythe's towels to clean himself, he left, saying that Forsythe could "call him."

Ms. Forsythe went the next day to the police station where she told her story of the previous night's events to then-Police Chief Maxwell Frye. Frye ordered a complete criminal investigation of the incident and assigned it to a Sergeant Chaplin. Forsythe also was allowed to meet, at her request, with a female officer, Detective Susan Benson of the Sexual Assault Unit. Benson took Forsythe for a medical examination, and eventually took her formal statement, which contained all of the above-described details. Officers also went to Forsythe's apartment and collected physical evidence, including the towel Ziegler used.

Forsythe then picked Ziegler out of a police lineup, and she eventually passed a police-administered polygraph test regarding the alleged rape. Further, police radio records confirmed that Ziegler was in the vicinity of Forsythe's apartment at the time she says the rape occurred. Forsythe's neighbor also gave a statement regarding Forsythe's demeanor on the morning after the incident which corroborated Forsythe's own statement.

Ziegler met with the officers investigating the Forsythe incident, was read his rights, and after answering a few preliminary questions,

4

invoked the Fifth Amendment. He never gave a statement regarding his version of the incident.

In late August of 1979, Chief Frye had informed Ziegler that he was being suspended without pay pending the results of the Forsythe investigation. Meanwhile, Detective Benson and Sergeant Chaplin had met with State's Attorney Warren Duckett. After Benson presented all the evidence she had, she recommended that rape charges be filed. The others disagreed, and Duckett concluded that because he was not confident that the available evidence respecting the non-consensual nature of the incident would suffice to convict, he declined to prosecute Ziegler for any criminal violation. Duckett notified Chief Frye of his decision.

Chief Frye was given the criminal investigation file. On September 7, Frye met with Ziegler to conclude the department's internal affairs investigation of the incident. Ziegler, accompanied by his attorneys, made no statement but agreed to accept whatever punishment the Chief chose. Chief Frye apparently made no further inquiry, but accepted Ziegler's offer and decreed the following punishment: (1) one month's suspension without pay; (2) transfer of Ziegler to desk duty on the Telephone Reporting Service; (3) loss of personal patrol vehicle; and (4) that he consult the Police Chaplain for counselling. In a deposition given for this case, Frye testified that, in setting this penalty, he did not dispute the veracity of the criminal file materials, including Forsythe's statement.

The following June, Frye put Ziegler back on street duty with a car, gun, and uniform. That month, Ziegler visited Forsythe's workplace, but she was not there at the time. When she learned Ziegler had been there, Forsythe called Chief Frye and expressed her concern that he was back on street duty. Frye, according to his memorandum of the call, told her not to talk to many people about the incident and that if she kept calling, she would be sued.

Frye retired in the mid-1980s, and was replaced by William Lindsey, who was himself eventually replaced by George Wellham. Wellham was Chief of Police in 1990 when Ziegler allegedly raped Jones.

Ms. Jones then brought this action in Maryland state court seeking damages for the alleged rape by Ziegler and originally naming

Ziegler, Chief Wellham and the County as defendants. Her claims against Ziegler alleged liability under 42 U.S.C. § 1983 for violation, under color of state law, of her constitutional rights under the Fourth and Fourteenth Amendments and under state law for common law battery. Her claims against the County and Chief Wellham alleged liability on various alternative theories under § 1983 and state common law. Following removal of the action to federal court, the claims against the County and Chief Wellham were severed from those against Ziegler, and those against Ziegler proceeded to a jury trial in which the jury found him liable and awarded Jones compensatory damages of $650,000 and punitive damages of $400,000. Following entry of judgment against Ziegler on this jury verdict, Jones was permitted to file an amended complaint which added to those claims still pending for disposition against the County and Chief Wellham claims against former Chiefs of Police Frye and Lindsey in their individual and official capacities. In her amended complaint, Jones sought to impose liability upon the County under various federal and state law claims: under § 1983, for municipal liability based upon the official conduct of the three police chiefs in retaining Ziegler on the police force, either as a matter of County-condoned "custom or practice," or as ad hoc policy choices of the police chiefs attributable to the County; under state common law, for vicarious liability for the battery committed by Ziegler and for the negligent conduct of the police chiefs in allowing Ziegler to return to and remain on street duty; and under state statutory law imposing on the County an obligation to indemnify any of its employee-defendants against whom liability was imposed. Finally, the complaint sought under § 1983 to impose supervisory liability upon the police chiefs in their individual capacities for their conduct relative to Ziegler's retention on duty.

On motions of the County and the three police chiefs, the district court granted summary judgment dismissing all of Jones' § 1983 claims against those parties; dismissed Jones' statutory indemnification claim against the County; and declined to exercise supplemental jurisdiction over Jones' state law claims against the County seeking to impose vicarious liability for Ziegler's battery and the police chiefs' negligence in allowing Ziegler to remain on duty.

These appeals by Jones in No. 95-2882 and by Ziegler in No. 95-2966 followed and were consolidated in this court.

6

II.

In No. 95-2882, Ms. Jones challenges only the dismissal of her § 1983 municipal liability claim against the County and her § 1983 supervisory liability claim against Police Chief Frye.**1** We take those in order.

A.

Jones' municipal liability claim against the County, as pleaded and sought to be supported against the County's motion for summary judgment sought, though confusedly, to impose liability on alternative theories: (1) that Jones' 1990 rape by Ziegler was directly caused by the County's condonation, with deliberate indifference to its consequences, of a known "custom or usage" of its police chiefs in failing to impose adequate discipline for sexually-related conduct such as Ziegler's; (2) that Jones' 1990 rape by Ziegler was directly caused by the deliberately indifferent decisions of Chief Frye in 1979 and 1980, first to retain Ziegler in service, then to return him to street duty, despite knowledge of his propensity for sexual misconduct while on duty, which decisions are attributable to the County as ad hoc policy choices of Frye as authorized final policy maker in police personnel matters.

The district court rejected the "custom or usage" theory of liability on the basis that the undisputed facts of record failed, as a matter of law, to show the "persistent and widespread" practice required to invoke that theory. See Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987). On this appeal, Jones has specifically "acquiesce[d]" in that ruling. Appellant's Br. 25. She therefore relies solely on her claim of error by the district court in rejecting her alternative theory of liability by virtue of Chief Frye's decisions, as final policy maker for the County, in failing to discharge or at least to keep Ziegler off

_____

**1** She therefore does not challenge the district court's dismissal on the merits of her § 1983 supervisory liability claims against Police Chiefs Wellham and Lindsey nor of her state-law indemnification claim against the County. Neither does she challenge the district court's refusal to exercise supplemental jurisdiction over her state common law vicarious liability claim against the County.

7

street duty back in 1979 and 1980 following the Forsythe incident. We therefore turn to that claim of error.

Jones' specific reliance is on the theory of municipal liability recognized in Pembaur v. Cincinnati, 475 U.S. 469 (1986). Under that theory, "municipal liability may be imposed for a single decision by municipal policy makers under appropriate circumstances," id. at 480, and "municipal policy makers" include not only a municipality's "properly constituted legislative body," but also those "officials `whose acts or edicts may fairly be said to represent official policy.'" Id. (quoting Monell v. New York City Dept. of Social Servs., 436 U.S. 658 (1978)). Whether a particular official's "acts or edicts" may be attributed to a municipality as its "policy" depends upon whether the official "possesses final authority to establish municipal policy with respect to [the particular act or edict] ordered." Id. 481. Final authority to establish municipal policy in a particular area contemplates more than "discretion in the exercise of particular functions" in that area; responsibility "for establishing final policy with respect to the subject matter in question is required." Id. at 482-484; see also Spell, 824 F.2d at 1386 (implies more than "discretionary authority in purely operational aspects of government").

Critically, Pembaur dealt only with a "policy" decision by a municipal official that directly commanded a constitutional violation, see id. at 484 (Fourth Amendment search). Its specific holding did not, therefore, touch official "acts or edicts" that, though not themselves unconstitutional, hence not the immediate cause of constitutional injury, might be shown to have caused a constitutional violation by others. That, of course is the factual situation presented in the case at issue, and for Pembaur's theory of municipal liability to apply here, it must be considered to reach such decisions as well as those directly commanding or effecting constitutional violations. We have not, apparently, ever directly addressed that issue, though we have, of course, applied Pembaur to single policy decisions that were themselves unconstitutional, hence were the immediate causes of constitutional violations. See, e.g., Hall v. Marion Sch. Dist. No. 2, 31 F.3d 183 (4th Cir. 1994) (unconstitutional firing by school board). Other circuits have, however, simply assumed Pembaur's application to single pol-

8

icy maker decisions which though not themselves unconstitutional were the ultimate causes of constitutional violations.**2**

Because the Supreme Court recently has granted certiorari in <u>Bryan County v. Brown</u>, ___ U.S. ___, 116 S. Ct. 1540 (U.S. Apr. 22, 1996) (No. 95-1100), to consider issues that may touch upon whether <u>Pembaur</u> applies at all to such situations, we will reserve decision on that threshold question and simply assume for purposes of this case that, in otherwise appropriate circumstances, <u>Pembaur</u>'s single-decision principle can apply to single policy maker decisions not themselves unconstitutional, such as those of Chief Frye here in issue. In making that assumption, we also assume (as did the district court) that in applying <u>Pembaur</u> to this type situation, the imposition of municipal liability would require (as it would not with respect to decisions themselves unconstitutional, <u>see City of Oklahoma v. Tuttle</u>, 471 U.S. 808, 822 (1985)), proof of deliberate indifference of the decision maker to the possible consequences of his decision, hence a "conscious choice" of the course of action taken, <u>see City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989), and a close causal connection between the decision and the ultimate constitutional injury inflicted. <u>See id.</u> at 391 (policy choice must have "actually caused" the constitutional violation); <u>Tuttle</u>, 471 U.S. at 823 ("affirmative link"); <u>Spell</u>, 824 F.2d at 1391 ("`almost bound to happen, sooner or later', rather than merely `likely to happen in the long run'").

Jones' <u>Pembaur</u> claim, as indicated, is that Chief Frye's November 1979 decision not to discharge Ziegler, followed by his June 1980

_____

**2** <u>See</u>, <u>e.g.</u>, <u>Brown v. Bryan County</u>, 67 F.3d 1174, 1183-85 (5th Cir. 1995) (municipal liability based upon decision by sheriff to hire deputy with known record of violence who later committed excessive force violation in arrest), <u>cert. granted</u>, 116 S. Ct. 1540 (U.S. Apr. 22, 1996) (No. 95-1100); <u>Graham v. Sauk Prairie Police Comm'n</u>, 915 F.2d 1085, 1104 (7th Cir. 1990) (decision by municipal police commission to hire psychologically troubled police officer who later shot arrestee could give rise to municipal liability if commission aware of psychological problems); <u>Parker v. Williams</u>, 862 F.2d 1471, 1477, 1480 (11th Cir. 1989) (municipal liability based upon decision of Sheriff to hire jailer with known history of drug use, mental problems, and indecent exposure who later raped inmate).

9

decision to return him to street duty, constituted <u>ad hoc</u> policy decisions by an official having final policy making authority with respect to such personnel matters; that they were made with deliberate indifference to the risks they entailed for local citizens; and that as a proximate result of these decisions Ziegler was put in a position to and did rape Jones some ten years later.

The district court, reflecting in a memorandum opinion the general understanding of <u>Pembaur</u> above outlined as ours, rejected this claim by summary judgment. Rejection was on the alternative grounds that as a matter of law on the undisputed material facts: (1) Frye's decisions were not "policy" decisions, but merely discretionary ones not attributable to the County as its official policy; (2) in any event, Frye's decisions were not taken in deliberate indifference to the risks entailed to local citizens; and (3) further, there was not a sufficiently close causal connection between the decisions and the rape ten years later to impose liability on the County. J.A. 1154-62 (Memo. op.).

Reviewing the district court's grant of summary judgment <u>de novo</u>, <u>see Hodge v. Jones</u>, 31 F.3d 157, 163 (4th Cir. 1994), we affirm, though on somewhat different reasoning.

The district court addressed the question whether Frye's two decisions respecting Ziegler constituted County policy and the question whether they were taken with deliberate indifference as separate ones. <u>See</u> J.A. 25-30. Addressing them so, the court first noted, rightly, that not every decision made by a policy maker in a particular area of government necessarily involves "policy" choice, <u>see Pembaur</u>, 475 U.S. at 481-82. And, the court then concluded, without elaboration, that Frye's decisions were merely "<u>ad hoc</u> disciplinary" ones taken in "exercise of his discretion" which "had no general applicability," hence did not constitute "actionable official policy." J.A. 26.

Without intending rejection of the district court's first ground of decision, we turn to the question of whether the actions at issue were taken with deliberate indifference. The district court concluded upon extensive review of the record that, as a matter of law, that could not be found. We agree with that conclusion, and believe that it is upon that basis that the prior conclusion that the decisions did not constitute official County policy should be rested. That seems the clear import

10

of City of Canton, where the Court indicated that a municipal decision that is not itself unconstitutional can only be found to involve the deliberate choice between alternatives that is the hallmark of "policy" if it was taken by the policy maker with deliberate indifference to the rights of potentially affected citizens. 489 U.S. at 389 ("Only where a [municipality's conduct] evidences a `deliberate indifference' to the rights of [municipal] inhabitants can such a shortcoming be properly thought of as a city `policy or custom' that is actionable under § 1983").[3]

As indicated, we agree with the district court's conclusion that on the summary judgment record, Frye's decisions respecting Ziegler's retention and duty status following the Forsythe incident back in 1979 and 1980 could not be found to reflect deliberate indifference. The district court properly emphasized as the principal basis for its conclusion the results of the internal police investigation of the incident undertaken under Frye's direction.

Specifically, the court relied on the following undisputed facts. Following an internal department investigation by two officers designated for the purpose, their report, essentially reflecting the facts outlined in Part I of this opinion, was submitted to the State's Attorney's Office for consideration of filing rape charges against Ziegler. The State's Attorney declined to prosecute, for the reason, as officially reported to then-Chief Frye, that because of the absence of any signs of trauma or physical injury and the arguable indicia of consent, he thought the evidence not sufficient to justify the criminal charge. With this prosecutorial decision in hand, Frye made the decision to discipline but not discharge Ziegler and, after a six-month interval, to return him to street duty.

We agree with the district court that on those undisputed facts, Frye's decisions could not be found to be the result of deliberate indifference. With the benefit of hindsight, they were clearly unfortu-

_____

[3] The deliberate indifference requirement is not related to the degree of fault (if any) that may be an element of the ultimate constitutional violation at issue in this type situation, but exists as a necessary fault basis for imposing direct, not vicarious, municipal liability for any constitutional violation by municipal employees that is caused by such policy decisions. See City of Canton, 489 U.S. at 388 & n.8.

11

nate, might perhaps be thought imprudent, or even be found legally negligent, but that does not suffice; only decisions taken with deliberate indifference to the potential consequences of known risks suffices to impose municipal liability on the basis that such decisions constituted official County "policy." See City of Canton, 489 U.S. at 388 & n.7 ("deliberate indifference," rather than "gross negligence" of policy maker required to impose municipal liability for policy maker decisions not themselves unconstitutional). That, as indicated, could not, as a matter of law, be found here.

In any event, we also agree with the district court's alternative ground of decision: that Frye's 1979 and 1980 decisions respecting Ziegler's retention and duties could not, as a matter of law, be found the sufficiently direct cause of Ms. Jones' rape by Ziegler some ten years later. The causation requirement for imposing municipal liability for policy maker decisions not themselves unconstitutional is a stringent one deriving from the necessity to avoid the effective, but forbidden, imposition of vicarious liability on municipalities. See Monell, 436 U.S. at 692-94 (municipal liability imposed only when "execution of . . . policy . . . inflicts the injury"). The policy must be "the moving force" behind the ultimate violation, Polk County v. Dodson, 454 U.S. 312, 326 (1981); there must be an "affirmative link" between the policy and the violation; mere but-for causation will not suffice, Tuttle, 471 U.S. at 823. As we have put it: the challenged policy decision must be one that made the ultimate violation "'`almost bound to happen, sooner or later', rather then merely `likely to happen in the long run.'" Spell, 824 F.2d at 1391.

We agree with the district court that the causal link between Frye's decisions in 1979 and 1980 not to discharge Ziegler outright and Ms. Jones' rape by Ziegler in 1990 is simply too attenuated to satisfy that stringent causation requirement. Ms. Jones points out that if Ziegler had been discharged then, he would never have had the opportunity that later arose to rape her. But, as indicated, mere cause-in-fact does not suffice to establish the required affirmative link. If that were the test, every depredation of this sort would give rise to municipal liability, for every § 1983 claimant harmed by such employee conduct could "point to something the [municipality] `could have done' to prevent the unfortunate incident." City of Canton, 489 U.S. at 392. Ms. Jones further suggests that the Forsythe incident and her rape ten

12

years later were merely the tip of the iceberg; that there must have been other incidents involving Ziegler of a comparable nature that revealed the true inevitability of her rape once Ziegler was kept on the force in 1979. Assuming such incidents would have strengthened proof of the requisite cause, it suffices to observe that they do not appear in this record, and cannot of course be assumed. So far as the record shows, Ziegler was kept on the force following a sexual incident in 1979 whose circumstances were thought by the responsible state prosecutor to be too ambiguous to warrant criminal charges and, after serving on the force for the following ten years without engaging in any comparable behavior, he raped Ms. Jones while on duty. We conclude that, as a matter of law, the link between the decision to keep him on in 1979 and the constitutional violation ten years later is too remote to impose liability upon the County under relevant § 1983 principles.

B.

Turning to the district court's dismissal by summary judgment of Ms. Jones' § 1983 claim against Frye in his individual capacity, we find no error.

While a municipal liability claim based upon a particular official's attributed conduct and a supervisory liability claim against that official based upon the same conduct are not perfectly congruent, see Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994), each requires proof both of the official's deliberate indifference and of a close affirmative link between his conduct and a resulting constitutional violation by a subordinate. See id.

That being so, the supervisory liability claim against Frye was properly rejected for the same reasons properly relied upon by the district court in rejecting the municipal liability claim.

III.

In No. 95-2966, Ziegler claims reversible error in three district court rulings: (1) improper jury instruction on the constitutional claim against him; (2) failure properly to deal with the risk of jury taint by

13

prejudicial media publicity; (3) refusal to ask a requested voir dire question of potential jurors. We take these in order.

A.

Treating Ms. Jones' § 1983 claim as one alleging a violation of her Fourth Amendment right not to be subjected to excessive force in the course of an arrest, Ziegler assigns as error the district court's refusal to instruct the jury, as requested, that his conduct must be judged under the "objectively unreasonable/excessive force" standard prescribed in Graham v. Connor, 490 U.S. 386 (1989). This of course misconstrues the nature of the constitutional claim. Because the harm inflicted did not occur in the course of an attempted arrest or apprehension of one suspected of criminal conduct, cf. Tennessee v. Garner, 471 U.S. 1, 7-9 (1985), the claim was not one of a Fourth Amendment violation, but of the violation of the substantive due process right under the Fourteenth Amendment not to be subjected by anyone acting under color of state law to the wanton infliction of physical harm. See Ingraham v. Wright, 430 U.S. 651, 673 (1977) (excessive force in paddling school child); Doe v. Taylor Ind. Sch. Dist., 15 F.3d 443, 450-52 (5th Cir. 1994) (sexual abuse by government employee). The district court instructed the jury that if it found that Ziegler forcibly raped Ms. Jones under the circumstances she claimed, this would constitute a violation of her constitutional rights under the Fourteenth Amendment.[4] J.A. 380. This effectively defined the Fourteenth Amendment right to bodily integrity specifically at issue in this case and accurately stated what had to be found from the evidence in order to impose liability for its violation. The district court did not err by refusing to give the requested instruction on "objective reasonableness."

---

[4] The court actually instructed that forcible rape would constitute a deprivation of both Fourth and Fourteenth Amendment rights. J.A. 380 While, as indicated, the evidence did not implicate the Fourth Amendment, the court's technical error in this respect could not have prejudiced Ziegler.

14

B.

Ziegler next challenges the court's refusal to inquire of jurors whether any had read either of two newspaper articles containing allegedly prejudicial material. One article referred to the 1979 Forsythe incident which the district court had ruled was inadmissible as evidence in the case against Ziegler. The second article mentioned that one of Ziegler's impeachment witnesses had failed a lie-detector test concerning his testimony. Although Ziegler asked the district court to question the jurors as to whether any had read these articles, the court, following consideration of the parties' submissions, declined to do so.

In United States v. Hankish, 502 F.2d 71 (4th Cir. 1974), we held that

> the procedure required by this Circuit where prejudicial publicity is brought to the court's attention during a trial is that the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined . . . to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further.

Id. at 77 (quoting Margoles v. United States, 407 F.2d 727, 735 (7th Cir. 1969)). Ziegler seizes upon the emphasized language to assert that the district court erred in failing to make the necessary inquiry. We disagree.

As Hankish also held, a district court need not raise the question with the jurors unless under the totality of circumstances there is a "substantial reason to fear prejudice." Id.; Aston v. Warden, Powhatan Correctional Ctr., 574 F.2d 1169, 1172 (4th Cir. 1978). And, whether there is such a "substantial reason," hence a necessity to make inquiry, is committed in the first instance to the district court's informed discretion. United States v. Jones, 542 F.2d 186, 194 (4th Cir. 1976); United States v. Grande, 620 F.2d 1026, 1031 (4th Cir. 1980); see also Marshall v. United States, 360 U.S. 310, 312 (1959). Here, the

15

district court, after consideration of the relevant circumstances, determined that there was not substantial reason to fear prejudice, hence no necessity to raise the question with the jury. Reviewing that determination for abuse of discretion, we find none.

The district court properly noted that only one of the eight jurors sitting in the case was a resident of the county in which the newspapers were circulated; that the court had more than once admonished the jurors that they should avoid media publicity about the trial; and that there was no indication before the court that those admonitions were not being obeyed. J.A. 325-27. It was further manifest from materials before the court that the articles were only published on the last day of trial after all the testimony had been received and that they were not prominently featured as headline items or in sensational terms but as relatively short items in the newspapers' interiors devoted mainly to factual accounts of open proceedings in the case.

Under these circumstances, we cannot find abuse of discretion in the district court's determination that the risk (1) that any juror had actually read the articles, and (2) that if any had, their reading had actually prejudiced Ziegler's case, was not substantial enough to compel raising the question with all jurors. To make such an inquiry, of course, entails a countervailing risk which district courts must factor into their discretionary determination: that the existence of possibly prejudicial publicity about which no juror may have been aware would now be revealed, or, if already revealed, ascribed a greater significance than its contents actually warranted. See Virgin Islands v. Dowling, 814 F.2d 134, 137 (3d Cir. 1987) ("Moreover, in banc questioning risks spreading taint where none exists."); cf. United States v. Sababu, 891 F.2d 1308, 1334 (7th Cir. 1989) (noting countervailing risk of questioning when jury exposed to material not properly in evidence).

Here, the timing of the publicity's appearance, its inconspicuous placement in the newspapers, its brief and mainly innocuous content, the long odds against any jurors having actual access to it, coupled with the presumption that jurors would properly observe the court's admonitions to avoid or disregard media publicity about the case, warranted the district court's discretionary decision to rely on its admonitions and not risk countervailing prejudice by revealing the

16

publicity's existence. See Grande, 620 F.2d at 1031 (no inquiry required where allegedly prejudicial material appeared in only one paragraph of 26-paragraph article); id. (admonitions, while not ipso facto dispositive, properly weighed in calculating risk of prejudice).

C.

Ziegler's final claim of error is in the district court's refusal to ask one of his requested jury voir dire questions: whether, in deciding the case, the jurors would follow their consciences rather than the law if they disagreed with the law.

Ziegler cites no authority for the proposition that this particular question must, if requested, be put to a civil jury (presumably in all cases, since it has no evidence-specific relevance). None of the cases he cites as authority dealt with this broad, general question, nor with questions even roughly comparable to it in their generality. The form of voir dire questions to be submitted under Fed. R. Civ. P. 47(a) (as under parallel Fed. R. Crim. P. 24(a)) is committed to the discretion of the district courts and there is of course no compulsion to ask every question requested by counsel. United States v. Robinson, 804 F.2d 280, 283 (4th Cir. 1986) (under parallel criminal rule). Abuse of discretion in declining to ask a particular question occurs only if the failure hinders a party's ability to make reasonable use of its challenges. United States v. Brown, 799 F.2d 134, 136 & n.3 (4th Cir. 1986) (abuse only where party "denied the right to some surface information about prospective jurors which might furnish a basis for challenge"). That surely cannot be said about the refusal to ask this broad, general question, particularly where, as here, the general substance of the question was implicit in others that were asked: whether there was "any reason that I have not covered . . . that you feel would affect your ability to be an impartial juror;" whether "anyone . . . has any religious or moral scruples that would affect your ability to . . . serve as a juror in this case." J.A. 56, 57.

Accordingly, the district court did not abuse its discretion in declining to ask this requested question of the jurors.

In No. 95-2882: AFFIRMED
In No. 95-2966: AFFIRMED

17