Jackson **BAYNARD**, Plaintiff,

v.

**Craig J. LAWSON, et al., Defendants.**

**No. Civ.A. 99–621–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Sept. 12, 2000.

Stephen C. Glassman, Vienna, VA, for plaintiff.

Francis J. Prior, Jr., Siciliano, Ellis, Dyer & Boccarosse, Fairfax, VA, Tina M. Maiolo, Carr Goodsen Lee & Warner, Washington, DC, John T. Burch, Jr., Burch & Cronauer, PC, Washington, DC, for defendants.

## MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court are defendant Catherine Malone's ("Malone") Motion for Judgment Notwithstanding the Verdict and defendant Alexandria City School Board's ("ACSB") Motion for Judgment Notwithstanding the Verdict or in the Alternative [for] a New Trial. This action, which was tried before a jury over the course of five days beginning March 6, 2000, was brought by Jackson Baynard, a twenty year-old man, against the ACSB and various school officials for damages resulting from sexual abuse by his sixth grade teacher, Craig J. Lawson, beginning in 1990. After the Court entered judgment as a matter of law in favor of Paul Masem, the Superintendent of Alexandria City Schools, and Otto Beckhoff, the School District's Director of Personnel, the jury

1. Neither party has ordered a transcript of the trial. Therefore, we have relied on our

returned a $350,000 verdict against Malone and a $700,000 verdict against the ACSB.

The moving defendants contend that the evidence presented at trial failed, as a matter of law, to support the verdicts reached against Malone and the ACSB, pursuant to Section 1983, 42 U.S.C. § 1983, and Title IX, 20 U.S.C. § 1681(a), respectively.[1] For the reasons stated below, we find that the evidence was sufficient to support a verdict against Malone under Section 1983. However, the ACSB motion requires the Court to closely consider the meaning, for purposes of Title IX, of an official with the authority to institute "corrective measures." Because we find that plaintiff failed to prove, by a preponderance of the evidence, that a school official with the authority to institute corrective measures failed to adequately respond to plaintiff's situation, we grant the ACSB's Motion for Judgment Notwithstanding the Verdict.

## I. BACKGROUND

Plaintiff was a student in Lawson's sixth-grade class at the Charles Barrett Elementary School in Alexandria, Virginia, during the 1990–1991 school year. Early that year, Lawson initiated a sexually abusive relationship with plaintiff, which ultimately spanned eight years and manifested itself in sexual encounters during school in the classroom, bathrooms and hallways; on school grounds before and after school; at Lawson's apartment; at his vacation home; and even in plaintiff's home.

Malone was principal at Barrett during the 1990–1991 school year. At trial, evidence was presented that she was contacted by Steven Lecki, one of Lawson's former students, in March 1990, before plaintiff began attending Barrett. Lecki testified that he told Malone that he had been a student in Lawson's class at Barrett fifteen years earlier, and, during that time, he was sexually molested by Lawson. He also told her that Lawson is a

notes of the trial testimony to resolve these motions.

pedophile. Lecki told Malone that he did not want to report the abuse to the police, but that he thought that she should be aware of what happened to him because he did not want it to happen to others. Lecki advised Malone to be aware of whether Lawson was spending extra time with a student, such as giving him rides home. Malone recorded Lecki's name and number, and requested corroboration of his story. His mother, Margaret Lecki, called Malone the next day. Margaret Lecki testified that she told Malone that she knew about Lawson's abuse of her son, that the allegations were true, and that she had known about the abuse since her son told her fifteen years earlier.

Despite this information from the Leckis, Malone took no action. Malone explained that, at the time, she felt it was unnecessary to report the Leckis' allegations to Child Protective Services ("CPS") because she was concerned about the Leckis' credibility and Steven Lecki's unwillingness to cooperate with a police investigation. Malone said she thought it might be an isolated incident and did not think that anybody in the school was in danger.

Lawson remained a sixth grade teacher. For the next school year, 1990–1991, Baynard was assigned to Lawson's classroom. Lawson began sexually molesting Baynard soon thereafter. In November 1990, the school librarian, Lillian Newman, reported to Malone that she had seen Lawson with plaintiff sitting on his lap in Lawson's classroom before school. Specifically, Newman testified that she went to school early one day, and walked into Lawson's classroom to ask him for help in the computer lab. When she arrived at Lawson's room, she observed plaintiff sitting on Lawson's lap. Lawson had his right arm around plaintiff's shoulder, and their faces were very close. Upon seeing Newman, Lawson jumped up suddenly, dumping plaintiff onto the floor. Newman testified that Lawson appeared shocked to see her.

She also testified that she thought the "lap-sitting" was inappropriate, and that it did not look right. After the morning announcements, Newman went to Malone's office and reported the lap-sitting incident in detail.

Malone testified that she personally observed a certain "physicalness" between Lawson and his students, and discussed it with Lawson, mentioning plaintiff specifically. With respect to Newman's lap-sitting report, Malone testified that Newman gave more details to the jury than she gave to Malone at the time, although it was clear to Malone from Newman's report that Lawson and plaintiff were very physically close together, and that Newman thought it was inappropriate. The only actions Malone took in response to Newman's report was to meet with Lawson to discuss the lap-sitting incident. She told him that he had been observed behaving inappropriately with plaintiff. Lawson gave Malone the impression of a father-son chat, and, according to Malone, was open, unembarrassed and convincing. Malone did nothing more.

According to Malone's trial testimony, her suspicions were finally raised sometime between Thanksgiving and Christmas 1990, when a teacher at Barrett, Rosemary Herman, told Malone that a neighbor of hers, Helen Anderson, had called Herman at home to tell her that Lawson had abused children. Malone testified, "this linked things for me," and, in January 1991, she called Maxine Wood, a member of the ACSB, to get advice. Wood suggested that Malone report the situation to Otto Beckhoff, the Executive Director of Personnel of the ACSB. Malone followed this advice and told Beckhoff about the March 1990 report from the Leckis. She also mentioned Herman's report, and that Lawson was very physical with students, often having his arm around them. Inexplicably, Malone did not tell Beckhoff that Newman had seen plaintiff sitting on Lawson's lap.

Beckhoff immediately began an investigation. He had numerous conversations with Malone and asked her to write down any complaints from parents. He also told Malone to monitor Lawson more closely than other staff and to look out for inappropriate behavior. Malone testified that she responded to Beckhoff's direction by walking through the school building several times in the morning and afternoon, that she stopped at Lawson's classroom, that she went into Lawson's classroom when he was not there, that she monitored Lawson at recess and that she tried to be aware of Lawson's interactions with students. However, Malone also testified that she did not have an "official stake-out" program for Lawson. Rather, she had practices already in place that she thought would be sufficient to monitor him. She did not watch Lawson leave the building every day, although she coincidentally saw him leave about once a week. She testified that she never considered having Lawson removed from the classroom or talking to plaintiff's parents, and that, although she heard that Lawson took students on weekend camping trips, she believed that he had the endorsement of parents to do that, and therefore never told Lawson to stop the trips.

The testimony as to what Malone told Beckhoff about plaintiff is not entirely consistent. Malone testified that she may have told Beckhoff about a student's "clinginess" with Lawson, and her subsequent counseling of Lawson, but she did not know if she mentioned plaintiff's name and did not recall telling Beckhoff about the lap-sitting. Beckhoff testified that Malone gave him a type-written note reporting that she spoke to Lawson. The note did not mention plaintiff by name, but rather, merely used the initials "J.B." Beckhoff testified that it was probably within a few days of receiving the note that Malone told him who "J.B." was. Malone explained to Beckhoff that she saw Lawson putting his arm around plaintiff as they walked down the hall and she was concerned about it, and thus spoke to Lawson. Beckhoff does not remember reporting anything about plaintiff to Paul Masem, the superintendent of Alexandria City Schools, and does not think that he ever did.

Beckhoff's investigation continued until mid-March. He spoke to Steven Lecki and his parents, Ken Anderson (Helen Anderson's husband, who also had expressed concerns to members of the Barrett faculty about Lawson's past), examined Lawson's file, called Lawson's former school district in New Hampshire and contacted CPS. CPS told Beckhoff that the case was out of its jurisdiction because Lecki was now an adult. Beckhoff testified that by the time he spoke to Lecki's father he believed that Lawson had probably sexually abused Lecki. According to Beckhoff, he focused his investigation on Lecki, and never linked plaintiff to the investigation. His impression from Malone was that she had spoken to Lawson about several items, and that her "counseling" was not just with respect to a particular student. Beckhoff believed that, in the early 1990s, it was not inappropriate for a teacher to walk the halls with his arm draped around a student.

Beckhoff's investigation was transferred to Detective Snuffer of the Alexandria City Police Department. Snuffer conducted his own interviews of the same individuals with whom Beckhoff had spoken, and also interviewed Lawson. Steven Lecki cooperated with Snuffer to a point, but stopped when Snuffer asked him to initiate a tape-recorded telephone conversation with Lawson in order to gather evidence. On March 11, 1991, Snuffer issued a report in which he concluded that the Police Department could not proceed in its investigation because without Lecki's further cooperation or an agreement to testify, there was insufficient evidence against Lawson. The report also reflected Snuffer's conclusion that Lawson probably abused Lecki. Snuffer testified that they never uncovered evidence of other victims. According to Beckhoff, Snuffer spoke to Lawson on at

least three occasions. At one point, Lawson agreed to take a lie detector test, but later refused. In April 1991, Lawson tendered his resignation to the ACSB, indicating that he would leave Barrett at the end of the 1990–1991 school year, which he did.

Plaintiff testified that within a month of beginning sixth grade in Lawson's class, Lawson began paying him sexual attention. Lawson subjected plaintiff to sexual contact in the boys' bathroom and in the classroom on a daily basis. Lawson and plaintiff devised a signal so that Lawson would know when plaintiff was going to the bathroom and could follow him there. The two also began meeting alone before and after school in Lawson's classroom. On the morning visits, plaintiff would enter the school building through a side door once Lawson unlocked it, upon plaintiff's signal. Two to three times a week, plaintiff stayed after school with Lawson, sometimes for as long as one and a half hours. They would then walk out to Lawson's car in the faculty parking lot.

Lawson's sexual abuse of plaintiff persisted throughout the school year, and took place beyond the school building, at Lawson's apartment, his mother's house, his mountain cabin, and even in plaintiff's house. It continued, sometimes sporadically, until plaintiff was a freshman in college. At that point, plaintiff reported the abuse to the police for the first time. He also participated in a sting operation which allowed the police to gather evidence and led to Lawson's arrest and eventual conviction in November 1998.

Plaintiff filed this multi-count, multi-party lawsuit in April 1999. When the trial began, there were two remaining counts against the four remaining defendants. Plaintiff advanced Count I, Title IX, against the ACSB, and alleged that Malone, Wood, Beckhoff, and/ or the Superintendent of Schools, Paul Masem, as officials of the ACSB, failed to address the discrimination against plaintiff on the basis of sex which occurred as a result of the sexual abuse inflicted by Lawson. According to plaintiff, these officials waited too long to begin an investigation, conducted an inadequate investigation, did not take affirmative steps to protect him once the investigation began, and similarly failed to protect him after the police investigation ended. In Count II, plaintiff sued Malone, Beckhoff and Masem, in their individual and official capacities, under 42 U.S.C. § 1983, alleging that those defendants showed deliberate indifference towards his constitutional rights through the omissions described above.

At the close of plaintiff's case, we entered judgments as a matter of law in favor of Beckhoff and Masem. The jury was then charged with determining whether the ACSB was liable under Title IX and/ or Malone was liable under Section 1983. The jury deliberated for almost two days, and returned a verdict against Malone in the amount of $350,000, and a verdict against the ACSB in the amount of $700,000. Both of these defendants now separately move for judgments in their favor, notwithstanding the verdict.

## II. DISCUSSION

Neither defendant challenges how the jury was instructed on the legal standards. However, both defendants challenge the sufficiency of the evidence to support the jury's verdicts. Rule 50(b) of the Federal Rules of Civil Procedure permits litigants to renew motions for judgment as a matter of law within 10 days of a jury verdict. The court may direct entry of judgment as a matter of law if there is "no legally sufficient evidentiary basis for a reasonable jury to find for the party" on an issue. Fed.R.Civ.P. 50(b)(1)(C), 50(a)(1). To resolve the motion, the court must review all of the evidence in the record and draw all reasonable inferences in favor of the non-moving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* — U.S. —, —, 120 S.Ct. 2097, 2110, 147 L.Ed.2d 105 (2000). It may not make credibility determinations or weigh the evidence and must disregard all evidence favorable to the

moving party that the jury is not required to believe. *Id.*

## A. Defendant Catherine Malone's Motion for Judgment Notwithstanding the Verdict

Malone contends that we should award her judgment notwithstanding the verdict because the evidence presented at trial was insufficient, as a matter of law, to justify any judgment or award against her.[2] In the alternative, Malone requests remittitur.

### 1. Sufficiency of the Evidence to Demonstrate Deliberate Indifference

■ Malone correctly cites *Shaw v. Stroud,* 13 F.3d 791, 799 (4th Cir.1994), for the three elements that must be proven in order to impose supervisory liability under Section 1983:

1. The supervisor had actual or constructive knowledge that her subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;

2. The supervisor's response was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and

3. There was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered.

Malone focuses only on the second, "deliberate indifference" element, to support her argument that the evidence adduced at trial was inadequate to establish liability. She contends that the jury could not have found "deliberate indifference" unless it based that finding on three pieces of evidence: (1) Malone did not report the Leckis' allegations to any higher officials for a period of ten months; (2) Malone's inadequate response to the lap-sitting incident and plaintiff's observed "clinginess" with Lawson; and (3) Malone's failure to increase her monitoring of Lawson once the school's investigation began.

The parties did not object to the Court's jury instruction on deliberate indifference at trial, nor do they challenge the instruction now. The jury was instructed that to establish that Malone acted with deliberate indifference, plaintiff had to prove that Malone acted with a reckless disregard to a known risk by showing that (1) Malone knew, or that a reasonable person in her position would have known, that Lawson posed a substantial risk of constitutional injury to students like the plaintiff, and (2) despite such knowledge, Malone acted recklessly by disregarding that known substantial risk. The jury was further instructed that deliberate indifference is a high standard, and that a showing of mere negligence will not suffice. That is, mere errors in judgment, sloppiness, or ineffective actions, even if they result in unfortunate consequences, do not constitute deliberate indifference.

■ Malone argues that the delay between the Leckis' report of Lawson's abuse and her report of it to her superiors did not show deliberate indifference as a matter of law. She relies on *Jones v. Wellham,* 104 F.3d 620, 627 (4th Cir.1997), as support for this argument. In *Jones,* a woman who claimed to be the victim of rape by a police officer advanced a Section 1983 action against the police chief. She alleged that the police chief's decision ten years before her rape to put the police officer that raped her back on duty, after he had been accused of sexual misconduct by another woman, constituted deliberate indifference. The Fourth Circuit affirmed the district court's finding of summary judgment in favor of the police chief, observing that the police chief decided not to discharge the officer for the original accusations of sexual misconduct only after a full internal investigation and after he was informed that the state's attorney would not prosecute due to insufficient evidence. *Id.* at 626–27.

---

**2.** At trial, Malone never raised the defense of    qualified immunity.

We agree with the district court that on those undisputed facts, [the police chief's] decisions could not be found to be the result of deliberate indifference. With the benefit of hindsight, they were clearly unfortunate, might perhaps be thought imprudent, or even be found legally negligent, but that does not suffice; only decisions taken with deliberate indifference to the potential consequences of known risks suffice to impose municipal liability on the basis that such decisions constituted official County "policy."

*Id.* at 627.

Malone argues that *Jones* holds that a supervisor's decision to return an employee to duty ten years before the relevant accusations was too remote, as a matter of law, to find the supervisor liable under Section 1983. We disagree with Malone's reading of *Jones.* The Fourth Circuit was relying on more than a mere remoteness in time to conclude that Section 1983 liability could not rest on the police chief's ten year-old decision to put an officer back on duty; the Fourth Circuit was also relying on the fact that the original accusations had been fully investigated, both by the police department and the state's attorney, and that the state's attorney concluded that there was a lack of evidence to prosecute the police officer. Also, the court was concerned about the time lapse between the police chief's decision and the events giving rise to plaintiff's injury. In our case, Malone conducted no investigation into the Leckis' accusations. She left Lawson in place and the resulting injury to plaintiff occurred only six months later. Given the corroboration of Steven Lecki's allegations by his mother, and the seriousness of the allegations, the jury could reasonably conclude that Malone showed deliberate indifference by failing to take any action whatsoever after receiving the Leckis' information.

Malone also argues that, as a matter of law, she was not deliberately indifferent by doing no more than counseling Lawson after the lap-sitting incident was reported to her. In support of this argument, Malone relies on *Doe v. Taylor Independent School Dist.,* 15 F.3d 443, 456 n. 12 (5th Cir.1994), for the principle that good faith but ineffective responses may satisfy a school official's obligations under Section 1983. According to Malone, Section 1983 liability cannot lie against her because she made a decision which, in hindsight, was wrong. Malone further argues that her failure to report the Leckis' accusations immediately and her failure to take further action upon hearing of the lap-sitting do not make her liable because they are two isolated incidents. We disagree, and find that reasonable jurors could conclude that Malone's failure to report the Leckis' accusations immediately, as well as her failure to report the lap-sitting incident to Beckhoff, especially after she knew that Lawson was being investigated for sexually abusing a student, was in reckless disregard of a substantial risk to plaintiff.

Finally, Malone argues that she did not, as a matter of law, show deliberate indifference by monitoring Lawson as she did after Beckhoff instructed her to monitor him. We need not decide this, because we have already found that, as a matter of law, reasonable jurors could conclude that Malone showed deliberate indifference by waiting to pass the Lecki report on to her superiors and failing to report the lap-sitting incident. Nevertheless, we also find that reasonable jurors could conclude that Malone's choice not to increase monitoring activities beyond her normal daily rounds of the school, after Beckhoff instructed her to closely monitor Lawson, showed deliberate indifference.

### 2. *Remittitur*

█ In the alternative, Malone requests that the jury verdict be set aside as excessive, because the alleged specific damages were only $52,000, consisting of past and projected expenses for psychotherapy. Plaintiff responds with six sample cases from five different jurisdictions in which

juries awarded larger verdicts to victims of sexual abuse by authority figures. We find that the jury did not act excessively in awarding $350,000, and that there was ample evidence in the record to support such a verdict, for the humiliation and mental anguish plaintiff has endured because of Lawson's conduct. *See Neese v. Southern Ry. Co.*, 350 U.S. 77, 76 S.Ct. 131, 100 L.Ed. 60 (1955) (where jury awards verdict under federal cause of action, district court should not disturb damage amount supported by the record). The jury heard several days of testimony about a preadolescent boy who was subjected to egregious, constant sexual abuse by his teacher, an authority figure children are taught to trust and not to question. It is not unreasonable that the jury awarded more than the special damages proved. For all of these reasons, Malone's motion will be denied.

B. *Defendant Alexandria City School Board's Motion for Judgment Notwithstanding the Verdict or in the Alternative a New Trial*

The ACSB contends that the $700,000 jury verdict awarded against it was erroneous as a matter of law because plaintiff failed to prove by a preponderance of the evidence that Malone was a school official with the authority to institute corrective measures against Lawson on behalf of the ACSB. The ACSB does not dispute the way the jury was charged on Title IX liability. The jury was instructed that the ACSB may be held liable for damages for the sexual abuse of plaintiff by Lawson if it found that plaintiff proved by a preponderance of the evidence that:

1. Malone was a school official who had authority to institute corrective measures against the offending teacher, in this case, Craig Lawson, on behalf of the school board;

2. Malone had actual notice of Lawson's misconduct; and

3. After gaining actual notice of Lawson's misconduct, Malone was deliberately indifferent to Lawson's misconduct.

Focusing on the first element of the instruction, the ACSB contends that Malone's authority to institute corrective measures against Lawson was never established for the jury. We agree.

Title IX provides, in pertinent part: "No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In *Franklin v. Gwinnett Co. Pub. Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court held that a damages remedy is available for a private cause of action brought to enforce Title IX. Sexual harassment is a form of discrimination for Title IX purposes. *Davis v. Monroe Co. Bd. of Educ.*, 526 U.S. 629, 649–50, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

The jury instructions on the Title IX count were directly derived from *Gebser v. Lago Vista Ind. School Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), the leading Supreme Court case on Title IX liability for school districts in the context of teacher on student sexual harassment. In that case, the Court squarely faced the issue of when a school district may be held liable under Title IX for the sexual harassment of a student by one of the district's teachers. *Id.* at 277. The Court held that traditional agency principles of respondeat superior do not apply to support liability for the school district. It set a higher standard than respondeat superior liability, and articulated the standard on which our instructions were based:

> [D]amages may not be recovered ... unless an official for the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.

*Id.*

In this case, it was undisputed that the only school official from which the

ACSB's liability could be derived was defendant Malone. The other school officials about whom evidence was presented were the named defendants Wood, Beckhoff and Masem. Plaintiff advanced a Section 1983 count against these three defendants, however, we found that, as a matter of law, these defendants could not be found liable under Section 1983. During pre-trial motions, we found that plaintiff could not establish that Wood had actual notice of Lawson's abuse of plaintiff. At the close of plaintiff's case, we found that he could not establish that Beckhoff and Masem had actual notice of Lawson's misconduct, to a large extent because Malone had not passed on all the information, nor that they were deliberately indifferent to the allegations about Lawson in that they took reasonable, appropriate measures to immediately investigate the charges and monitor Lawson through Malone. The actual notice and deliberate indifference elements of Section 1983 are identical to the second and third elements of Title IX. Therefore, plaintiff's failure to prove these elements for the Section 1983 counts against Wood, Beckhoff and Masem precluded him from doing so for the Title IX count against the ACSB. Malone is, therefore, the only possible school official from which the ACSB's liability could arise. Such liability could only be established upon a showing that she had authority to institute corrective measures on the ACSB's behalf.

Although *Gebser* did not discuss who might be an official with the authority to institute corrective measures for purposes of Title IX liability against the school district, the rationale behind its rejection of respondeat superior theories is instructive on that question. *See Floyd v. Waiters*, 171 F.3d 1264 (11th Cir.1999) (*Gebser* did not go into detail about the "appropriate person" to create Title IX liability of the school district). The Court explained the contractual nature of Title IX, and contrasted it to Title VII, observing that Title IX conditions "an offer of federal funding on a promise by the recipient not to discriminate, in what amounts to a contract between the Government and the recipient of funds." *Gebser*, 524 U.S. at 286, 118 S.Ct. 1989. It reasoned that, because the constitutionality of Title IX is rooted in Congress' power under the Spending Clause, and because the statute and its legislative history reflect a *quid pro quo* arrangement—federal funding in exchange for a prohibition of discriminatory conduct—it would be illogical to jeopardize the federal funding of an entire school district because discrimination had occurred if the school district did not know about, and therefore had no chance to cure, the discrimination. The Court therefore rejected principles of constructive notice and respondeat superior in the Title IX context, because to find otherwise would permit imposing financial liability on a school district that is unaware of the discrimination. *Id.* at 287, 118 S.Ct. 1989; *see Davis*, 526 U.S. at 643, 119 S.Ct. 1661 ("[a] recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action"); *Franklin*, 503 U.S. at 74, 112 S.Ct. 1028 ("[t]he point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for monetary award").

■ The *Gebser* formulation, "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf," has not been more explicitly defined and the Fourth Circuit has not addressed this issue. The ACSB urges us to adopt the approach of a pre-*Gebser* Fifth Circuit case, *Rosa H. v. San Elizario Ind. Sch. Dist.*, 106 F.3d 648 (5th Cir. 1997). *Rosa H.* also rejected traditional agency and constructive notice doctrines as adequate to create Title IX liability against school districts.

To this point, we have referred simply to the school district's knowledge and the school district's actions. But the district knows and acts only through individuals,

whether they be members of the school board, administrators at particular schools, or classroom teachers. We have yet to decide which individuals within the school district must have known of [the teacher's] abuse of [plaintiff] in order for us to conclude that the school district knew of the abuse.

106 F.3d at 659. The court observed, "[w]hether the school official is a superintendent or a substitute teacher, the relevant question is whether the official's actual knowledge of sexual abuse is functionally equivalent to the school district's actual knowledge." *Id.* at 660. The court held:

[A] school district can be liable for teacher-student harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so. This inquiry circumscribes those school employees in the chain of command whom the school board has appointed to monitor the conduct of other employees, and, as distinguished from reporting to others, remedy the wrongdoing themselves. At the same time, it locates the acts of subordinates to the board at a point where the board's liability and practical control are sufficiently close to reflect its intentional discrimination. It does so by omitting the bulk of employees, such as fellow teachers, coaches and janitors, unless the district has assigned them both the duty to supervise the employee who has sexually abused a student and also the power to halt the abuse.

*Id.*

Because we find the reasoning in *Rosa H.* to be sound, in light of *Gebser*, we adopt its standard for the "appropriate person." *See Floyd v. Waiters,* 171 F.3d at 1264 (post-*Gebser* decision endorsing two-part test to establish Title IX liability against a school district: (1) some supervisor with authority to take corrective action

was placed on notice of bad conduct, and (2) that supervisor was an official sufficiently high up in the chain-of-command that his acts constitute an official decision by the school district itself not to remedy the misconduct). *Rosa H.* is consistent with *Gebser*'s emphasis on creating liability for the school district only for actions that can be attributed to the school district. If a school district employee, such as a teacher, knows of discriminatory conduct but lacks the power to address the misconduct, by terminating the wrongdoer, for example, then it would contravene the "contractual framework" of Title IX to hold the school district liable for the employee's inaction.

Plaintiff does not challenge the application of the *Rosa H.* standard, but contends that it presented sufficient evidence at trial to demonstrate that Malone had the requisite "corrective" authority. In particular, plaintiff argues that because Malone had the authority to limit Lawson's contact with children after school, as well as to call a meeting between Lawson and plaintiff's parents, she had adequate authority upon which to base the ACSB's liability. Plaintiff cites no specific evidence presented at trial to support these assertions about Malone's power. Nevertheless, plaintiff concedes that Malone lacked the power to terminate Lawson, or even to transfer him to another school or an administrative position. In Virginia, a principal may submit recommendations to the division superintendent for the appointment, assignment, promotion, transfer and dismissal of personnel assigned to her supervision. Va. Code § 22.1–293. The Code does not authorize a principal to take these actions herself. At trial, Beckhoff testified that Malone could not have suspended Lawson. Also, plaintiff's trial exhibit # 5 was a copy of the ACSB policy in force during the relevant school year which authorized only the division superintendent to reassign teachers (as well as principals) within the division.

With respect to plaintiff's unsupported assertions that Malone was empowered to

limit Lawson's contact with students before and after school, we find that these would be insufficient "corrective measures," especially in light of the evidence at trial that much of Lawson's sexual contact with plaintiff was during school hours, often in the school bathroom. As for Malone's power to initiate a meeting between Lawson and plaintiff's parents to report the "clinginess" between the two, we similarly find that this does not rise to the level of a "corrective measure," especially in light of the evidence adduced at trial that plaintiff's parents regularly observed physical contact between plaintiff and Lawson and did nothing to stop it.

Several federal courts have addressed whether a school principal has the requisite authority to satisfy the *Gebser* standard, and a few have found that the authority is adequate. However, we are not bound by these decisions and we also note that, typically, a principal's authority in the context of student on student harassment is much greater than her authority in the context of teacher on student harassment. *See Murrell v. School Dist. No. 1,* 186 F.3d 1238, 1248 (10th Cir.1999) (in student on student Title IX harassment case, principal had requisite authority upon which to base school district's liability because, among other things, she had the authority to suspend students); *Warren v. Reading School Dist.,* 82 F.Supp.2d 395, 399 (E.D.Pa.2000) (finding that the *Gebser* Court did not intend to exclude a school principal from those authorized people whose non-feasance in the face of an allegation of sexual misconduct can lead to school district liability); *see also Crandell v. New York College of Osteopathic Medicine,* 87 F.Supp.2d 304, 321 (S.D.N.Y.2000) (supervisor had authority to take corrective measures, in satisfaction of *Gebser* standard, because he was primarily responsible for the design and management of defendant's programs, including selection of supervisory personnel); *Massey v. Akron City Bd. of Educ.,* 82 F.Supp.2d 735, 744 (N.D.Ohio 2000) (knowledge of discriminatory treatment can be imputed

to school district if a supervisor has remedial power to hire, fire and discipline the alleged harrager).

Because we find that plaintiff failed, as a matter of law, to prove by a preponderance of the evidence that Malone was an individual with requisite authority to take corrective measures and impose liability on the ACSB for purposes of Title IX, the jury verdict against the ACSB in favor of plaintiff will be reversed. The other issues raised in the ACSB's motion are rendered moot by this finding.

### III. CONCLUSION

For all these reasons, we will deny the Motion of defendant Malone and grant the Motion of the ACSB by an appropriate Order.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.