## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

RONALD EUGENE PLEASANTS, LAWRENCE WINDELL FARMER AND JACK LEONARD KING v. COMMONWEALTH OF VIRGINIA.

March 4, 1974.

Record No. 730258.

Present, All the Justices.

*S. W. Tucker* (*Sy DuBow; Hill, Tucker & Marsh*, on brief), for plaintiffs in error.

*Walter H. Ryland, Assistant Attorney General* (*Andrew P. Miller, Attorney General; Katherine L. Goolsby, Assistant Attorney General; Stacey F. Garrett, Assistant Attorney General*, on brief), for defendant in error.

HARMAN, J., delivered the opinion of the court.

The defendants and thirty-four other students were arrested and charged with unlawful trespass, Code § 18.1-173, while engaged in a protest on the grounds of Patrick Henry High School in Hanover County. The defendants were convicted by the trial court, sitting without a jury, and the punishment of each was fixed at 30 days in jail, with the jail sentences suspended.

The defendants challenge their convictions on the ground that the evidence failed to show that they were unlawfully upon the school grounds. Their argument presents a two-pronged attack upon the convictions. First, they point out that because they were students at the school, they were entitled to remain on the school grounds during the time that school was in session, absent the violation of some written regulation of the county school board. Second, they contend that their protest on the school grounds was constitutionally protected by the First Amendment.

Shortly after 9:00 a.m. on February 22, 1972, Alfred Turner, Jr., the principal of Patrick Henry High School, observed approximately 25 or 30 students, whom he knew should have been in class, assembled on the school grounds outside his office. When Turner approached the students, they advised him they were protesting his earlier suspension from school of eight students. The protestors demanded the immediate readmission to school of the suspended students. The principal refused to meet the demand.

After the initial confrontation between the principal and the protestors, the latter, from time to time, cheered, shouted and sang. Many students, at a time when they should have been engaged in their studies, appeared at the windows of the classrooms overlooking the demonstration site.

Some of the protestors walked or ran along the walkways and shouted to students in the adjoining classrooms, urging them to absent themselves from class and join in the protest. The entreaties were, to some extent, successful, for the number of protestors increased as the morning progressed.

A group of protestors "raided" the school cafeteria and removed chairs and a desk which were taken to the protest site on the grounds outside of the principal's office.

With the passage of time, the demonstration became progressively noisier. By noon, the noise of the demonstrators made it impossible for a teacher in a classroom approximately 75 to 100 feet from the demonstration site to be heard by the students in his class.

At various times during the morning, the principal and one or more of his teachers talked with the protestors, urging them to terminate the demonstration and to return to class. When these entreaties failed, the principal, around noon, called the police. The police began arriving at the school around 12:30. By 12:45, the number of demonstrators had increased to between 150 and 200 persons. Meanwhile, at the principal's direction, school busses had

been brought to the school.

At 1:00 p.m., the principal announced to the demonstrators that each must either return to class or board a bus which would return him home. The announcement included the warning that anyone failing to avail himself of these alternatives within five minutes would be arrested and charged with trespass.

Police officers, who had been mingling with the crowd, advised the principal that his announcement could not be heard because of the noise and commotion made by the protestors. The police then went through the crowd and "loudly" repeated the earlier announcement of the principal to the individuals and groups assembled at the protest site.

After waiting ten or fifteen minutes and observing that none of the protestors had returned to class or had boarded a bus to return home, the police arrested 37 persons. The remaining protestors then dispersed.

▪ Code § 18.1-173 provides, in pertinent part: "If any person shall without authority of law go upon or remain upon the lands, building or premises of another . . . after having been forbidden to do so, either orally or in writing, by the owner, lessee, custodian or other person lawfully in charge thereof . . . he shall be deemed guilty of a misdemeanor . . . ." This statute is applicable to public as well as to private property. *Johnson* v. *Commonwealth*, 212 Va. 579, 186 S.E.2d 53, *cert. denied*, 407 U.S. 925 (1972).

The defendants first argue that as regularly enrolled students they had "authority of law" to be and remain on the school premises unless this "authority of law" was revoked "pursuant to school board guidelines previously promulgated and explained."

While the record establishes that there were no regulations or guidelines adopted by the Hanover County School Board specifically controlling or limiting demonstrations by students or others on school property, this first argument must fail. The uncontroverted evidence shows that Turner, the principal, was the duly authorized representative of the school board. His duties, among others, required him "[to] administer the school; to look out for the safety of the students there; to supervise the entire school operation . . . for the school board [and] to carry out [school board] policies and to implement those policies where necessary." Turner was further charged with and responsible for "maintaining discipline in the school."

By law, each county school board in Virginia is a body corporate. Code § 22-63. As with other bodies corporate, it can act only through its duly authorized agents. That a school board, of necessity, must delegate responsibility for the day to day operation of schools to its agents and employees has been recognized by statute.[1]

As the duly authorized agent of the school board, Turner, the principal, was required to supervise the teaching and instruction of the students and was charged with maintaining order and discipline in the school. In so doing, he was vested with the inherent power to revoke, for good cause, the right of any student to remain upon school property when that student, alone or in concert with others, disrupted regular school activities or the maintenance of good order and discipline. In the absence of such power, the principal would have been unable to discharge his duties.

Here, when the protest demonstration became unduly disruptive of the educational process and of good order and discipline in the school, it became not only the right, but the duty, of the principal to take reasonable measures to restore order so that the educational process might continue. The action taken by the principal here was not only reasonable, but demonstrated great patience and restraint on his part.

This brings us to the second facet of the argument advanced by the defendants, *i.e.*, that they were entitled, in the exercise of their First Amendment right of free speech, to remain on the school grounds. On this point, they rely principally on *Tinker* v. *Des Moines School District*, 393 U.S. 503 (1969).

Their reliance is misplaced. While *Tinker* stands for the proposition that a student in a public school has First Amendment rights which he may freely exercise, it likewise stands for the proposition that, in exercising those rights, he may not do so in a manner which would materially and substantially interfere with discipline and good

---

[1] *See, e.g.,* Code § 22-230, which authorized the principal "for good cause" to suspend a student until the case is decided by the school board. Code § 22-231 made it the duty of the school board to suspend or expel a student "when the welfare and efficiency of the schools made it necessary." The foregoing statutes were in effect on February 22, 1972, the date of the protest demonstration. Acts of Assembly, 1972, c. 604, repealed these statutes and replaced them with Code §§ 22-230.1-230.2, which also provide the principal with the power of suspension and vest the school board, or a committee thereof, with power to suspend or expel a student under more precisely defined procedures. Code § 22-231.1 permits a principal or teacher, in the maintenance of order and discipline, to administer reasonable corporal punishment to a student under his authority so long as he acts in good faith and such punishment is not excessive.

order in the operation of the school or with the rights of others. For, as was stated in *Tinker*, ". . . conduct by a student in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech . . . ." *Id.* at p. 513.

More recently, in *Grayned* v. *City of Rockford*, 408 U.S. 104 (1972), Mr. Justice Marshall observed:

"We would be ignoring reality if we did not recognize that public schools in a community are important institutions, and are often the focus of significant grievances. Without interfering with normal school activities, daytime picketing and handbilling on public grounds near a school can effectively publicize those grievances to pedestrians, school visitors, and deliverymen, as well as to teachers, administrators, and students. Some picketing to that end will be quiet and peaceful, and will in no way disturb the normal functioning of the school. For example, it would be highly unusual if the classic expressive gesture of the solitary picket disrupts anything related to the school, at least on a public sidewalk open to pedestrians. On the other hand, schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, making studying impossible, block entrances, or incite children to leave the schoolhouse." *Id.* at pp. 118, 119.

Here, when the actions of the protestors are measured against the standards of conduct immunized by the First Amendment as explicated in *Tinker* and *Grayned*, it is clear that their actions were not immunized. Their conduct materially disrupted classwork, created substantial disorder and materially interfered with the rights of others. Therefore, the trespass statute was properly invoked and the convictions will stand.

*Affirmed.*