Filed:  October 19, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

Nos. 00-2340(L)
(CA-99-621-A)

_____

Jackson Baynard,

                                        Plaintiff - Appellee,

        versus

Catherine Malone, etc.,

                                        Defendant - Appellant.


_____

O R D E R

_____


        The court amends its opinion filed September 26, 2001, as

follows:

        On page 12, third full paragraph, line 9 -- the citation to

Franklin v. Gwinnett County is corrected to read "503 U.S. 60,

75-76."

                                For the Court - By Direction



                                /s/ Patricia S. Connor
                                        Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JACKSON BAYNARD,
Plaintiff-Appellee,

v.

CATHERINE MALONE, former principal
of the Charles Barrett Elementary
School,
Defendant-Appellant,

and

CRAIG J. LAWSON; ALEXANDRIA CITY
SCHOOL BOARD, a body corporate;
PAUL MASEM, individually and in his
official capacity as former
Superintendent of Schools,
Alexandria City Public Schools;
O.F. DUTCH BECKHOFF, individually

and in his official capacity as
former Assistant Superintendent of
Alexandria City Public Schools;
MAXINE J. WOOD, individually and
in her official capacity as Assistant
Superintendent of Alexandria City
Public Schools; SPORTS
INTERNATIONAL, INCORPORATED, a
Maryland corporation; CONWAY
SCHOOL BOARD, a New Hampshire
regional school board; ROBERT
KAUTZ, individually and in his
official capacity as former
Superintendent of Conway School
Board,
Defendants.

No. 00-2340

JACKSON BAYNARD,
Plaintiff-Appellant,

v.

ALEXANDRIA CITY SCHOOL BOARD, a body corporate; PAUL MASEM, individually and in his official capacity as former Superintendent of Schools, Alexandria City Public Schools; O.F. DUTCH BECKHOFF, individually and in his official capacity as former Assistant Superintendent of Alexandria City Public Schools,
Defendants-Appellees,

and

CATHERINE MALONE, former principal of the Charles Barrett Elementary School; CRAIG J. LAWSON; MAXINE J. WOOD, individually and in her official capacity as Assistant Superintendent of Alexandria City Public Schools; SPORTS INTERNATIONAL, INCORPORATED, a Maryland corporation; CONWAY SCHOOL BOARD, a New Hampshire regional school board; ROBERT KAUTZ, individually and in his official capacity as former Superintendent of Conway School Board,
Defendants.

No. 00-2341

2

JACKSON BAYNARD,
Plaintiff-Appellee,

v.

CATHERINE MALONE, former principal
of the Charles Barrett Elementary
School,
Defendant-Appellant,

and

CRAIG J. LAWSON; ALEXANDRIA CITY
SCHOOL BOARD, a body corporate;
PAUL MASEM, individually and in his
official capacity as former
Superintendent of Schools,
Alexandria City Public Schools;
O.F. DUTCH BECKHOFF, individually

and in his official capacity as
former Assistant Superintendent of
Alexandria City Public Schools;
MAXINE J. WOOD, individually and
in her official capacity as Assistant
Superintendent of Alexandria City
Public Schools; SPORTS
INTERNATIONAL, INCORPORATED, a
Maryland corporation; CONWAY
SCHOOL BOARD, a New Hampshire
regional school board; ROBERT
KAUTZ, individually and in his
official capacity as former
Superintendent of Conway School
Board,
Defendants.

No. 00-2568

3

JACKSON BAYNARD,
Plaintiff-Appellant,

v.

CATHERINE MALONE, former principal
of the Charles Barrett Elementary
School; ALEXANDRIA CITY SCHOOL
BOARD, a body corporate; PAUL
MASEM, individually and in his
official capacity as former
Superintendent of Schools,
Alexandria City Public Schools;
O.F. DUTCH BECKHOFF, individually
and in his official capacity as
former Assistant Superintendent of
Alexandria City Public Schools,

Defendants-Appellees,

and

CRAIG J. LAWSON; MAXINE J. WOOD,
individually and in her official
capacity as Assistant Superintendent
of Alexandria City Public Schools;
SPORTS INTERNATIONAL,
INCORPORATED, a Maryland
corporation; CONWAY SCHOOL
BOARD, a New Hampshire regional
school board; ROBERT KAUTZ,
individually and in his official
capacity as former Superintendent
of Conway School Board,
Defendants.

No. 00-2569

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CA-99-621-A)

4

Argued: June 6, 2001

Decided: September 26, 2001

Before WILKINS and MICHAEL, Circuit Judges, and
Irene M. KEELEY, Chief United States District Judge
for the Northern District of West Virginia,
sitting by designation.

_____

Affirmed by published opinion. Judge Wilkins wrote the majority
opinion, in which Chief Judge Keeley joined. Judge Michael wrote an
opinion concurring in part and dissenting in part.

_____

COUNSEL

ARGUED: William T. Bennett, BURCH & CRONAUER, P.C.,
Washington, D.C., for Appellants. Stephen C. Glassman, GLASS-
MAN & BULLOCK, Vienna, Virginia; Francis Joseph Prior, Jr.,
SICILIANO, ELLIS, DYER & BOCCAROSSE, Fairfax, Virginia, for
Appellees. ON BRIEF: Larry N. Burch, Tobi Burch-Rates, BURCH
& BURCH-RATES, L.L.C., Greenbelt, Maryland, for Appellee Bay-
nard. William J. Carter, Thomas L. McCally, Tina M. Maiolo, CARR
GOODSON, P.C., Washington, D.C., for Appellee Masem.

_____

OPINION

WILKINS, Circuit Judge:

Jackson Baynard brought this action pursuant to 42 U.S.C.A.
§ 1983 (West Supp. 2000) and Title IX of the Education Amendments
of 1972, see 20 U.S.C.A. §§ 1681-88 (West 2000), against Catherine
Malone, Otto Beckhoff, Paul Masem, and the Alexandria City School
Board ("the ACSB"). Malone appeals an order of the district court
denying her motion for judgment as a matter of law. See Fed. R. Civ.
P. 50. Baynard cross-appeals orders of the district court granting judg-

5

ment as a matter of law to Beckhoff, Masem, and the ACSB. We affirm all rulings of the district court.

I.

Prior to and during the 1990-91 school year, Craig J. Lawson was employed by the ACSB as a sixth-grade teacher at Charles Barrett Elementary School, where Malone was the principal.[1] In March 1990, a former student of Lawson's, Steven Leckie, met with Malone and informed her that he had been sexually molested by Lawson when he (Leckie) was a sixth-grade student, some 15 years earlier. Leckie warned Malone that Lawson was a pedophile and advised her to watch out for certain behavior by Lawson, such as spending extra time with a student. Leckie stated, however, that he was not interested in pressing charges against Lawson. The following day, Leckie's mother telephoned Malone and confirmed her son's story. Malone took no action after receiving this information and did not relay the information to anyone. She did not report the alleged incident to Child Protective Services (CPS) because of Leckie's unwillingness to become involved in a police investigation. Later that spring, an unidentified woman informed Malone during a school function that Lawson had sexually molested a student. Malone did not take the woman's name or make any record of this conversation.

In the fall of 1990, Baynard transferred to Charles Barrett Elementary and was assigned to Lawson's classroom. Lawson began to molest Baynard almost immediately, and the abuse continued until Baynard entered college. The abuse occurred on school grounds before, during, and after school hours; Lawson also abused Baynard during camping trips and at Lawson's home.

In November 1990, the school librarian, Lillian Newman, visited Lawson's classroom before school hours and observed Baynard sitting on Lawson's lap ("the lap-sitting incident"). Lawson's arm was around Baynard's shoulders, and their faces were very close together. When Lawson saw Newman he jumped up, spilling Baynard to the floor. Newman thought the behavior was inappropriate and related the

_____

[1] Lawson is not a party to this appeal.

6

incident to Malone later that morning. Malone spoke with Lawson, who apparently convinced her that what Newman had observed was an innocent "father-son chat." J.A. 166. Malone advised Lawson that she had observed excessive physical contact between Baynard and Lawson, which she characterized as being initiated by Baynard. Malone counseled Lawson to limit physical contact with students, and Lawson promised to admonish Baynard to behave more appropriately. Malone took no further action at that time.

Between Thanksgiving and Christmas, a teacher at Barrett, Rosemary Herman, reported to Malone that a neighbor had informed her that Lawson abused children. Malone responded that "she couldn't tell [Herman] not to say anything about this, because it was out in the neighborhood." Id. at 368. According to Malone's testimony, it was not until this point that she perceived a danger to Lawson's students. In January 1991, she contacted Beckhoff, the ACSB's personnel director. Malone told Beckhoff about the accusation made by Leckie in March 1990 and Herman's report and informed Beckhoff that Lawson was very physical with the students. However, Malone did not mention Baynard or tell Beckhoff about the lap-sitting incident.

Beckhoff immediately began an investigation. He instructed Malone to keep records of any and all complaints from parents and to monitor Lawson's activities. Malone complied with the latter request by walking the halls of the school several times a day, being sure to stop at Lawson's classroom. She also tried to watch Lawson at recess and observed his interactions with students. Although Baynard often stayed after school with Lawson--sometimes for as long as one and one-half hours--and Lawson frequently gave Baynard a ride home, Malone testified that she never observed them together during the course of her monitoring efforts.

Beckhoff's part of the investigation involved interviewing Leckie and his parents and the husband of the neighbor who had spoken to Herman.[2] Beckhoff also examined Lawson's personnel file and contacted Lawson's former school district in New Hampshire. As a result

_____

[2] Beckhoff informed Masem, the superintendent of the ACSB, that the investigation of Lawson was occurring and periodically updated Masem on its progress. Masem took no active role in the investigation.

7

of his investigation, Beckhoff came to believe that Leckie had been abused by Lawson. Beckhoff contacted CPS, which informed him that it could not investigate Leckie's allegations because Leckie was an adult. Beckhoff then involved the Alexandria City Police Department. Leckie cooperated with the police investigation but refused to initiate a tape-recorded telephone conversation with Lawson. As a result, the investigation was closed for lack of evidence.

Soon after the police investigation was closed, Lawson resigned from Barrett. He nevertheless continued to abuse Baynard until Baynard was a freshman in college. Baynard finally reported the abuse, and Lawson was arrested and convicted.

In April 1999, Baynard brought this action alleging, as is relevant to this appeal, that the ACSB had violated Title IX and that Malone, Beckhoff, and Masem were liable under § 1983. The district court granted judgment as a matter of law to Beckhoff and Masem at the close of the evidence. The jury returned verdicts against the ACSB for $700,000 and against Malone for $350,000. The district court thereafter granted judgment as a matter of law to the ACSB, reasoning that the ACSB could not be held vicariously liable because Malone lacked authority to institute corrective measures against Lawson. See Baynard v. Lawson, 112 F. Supp. 2d 524, 531-34 (E.D. Va. 2000). The court denied Malone's motion for judgment as a matter of law, reasoning that a rational jury could conclude from the evidence that Malone was deliberately indifferent to the risk of constitutional injury to Baynard. See id. at 529-30.

Malone now appeals, arguing that the district court erred in denying her motion for judgment as a matter of law. Baynard cross-appeals, maintaining that the district court erred in granting judgment as a matter of law to Beckhoff, Masem, and the ACSB. [3]

_____

[3] Baynard also makes a conclusory argument that he was entitled to a larger award of attorneys' fees from Malone. We reject this claim without further discussion.

8

II.

We first consider Malone's appeal of the denial of her motion for judgment as a matter of law, which we review de novo, see Konkel v. Bob Evans Farms Inc., 165 F.3d 275, 279 (4th Cir. 1999). We must view the evidence in the light most favorable to Baynard, the nonmovant, and draw all reasonable inferences in his favor without weighing the evidence or assessing the witnesses' credibility. See Sales v. Grant, 158 F.3d 768, 775 (4th Cir. 1998). "The question is whether a jury, viewing the evidence in the light most favorable to [Baynard], could have properly reached the conclusion reached by this jury." Benesh v. Amphenol Corp. (In re Wildewood Litigation), 52 F.3d 499, 502 (4th Cir. 1995). We must reverse if a reasonable jury could only rule in favor of Malone; if reasonable minds could differ, we must affirm. See Sales, 158 F.3d at 775; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (explaining that judgment as a matter of law is proper if "there can be but one reasonable conclusion as to the verdict").

There is no dispute concerning the legal standards that govern Baynard's § 1983 claim against Malone. It is well settled that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates."[4] Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). Such liability is not based on ordinary principles of respondeat superior, but rather is premised on "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984). In order to establish supervisory liability under § 1983, a plaintiff must demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive

_____

[4] There is no dispute that the molestation of Baynard by Lawson was a "constitutional injury."

9

> practices[ ]; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw, 13 F.3d at 799 (internal quotation marks omitted).

Malone first argues that there is no evidence to support a conclusion that she had actual or constructive knowledge of a risk to Lawson's students.[5] We disagree. By the end of 1990, Malone knew that Leckie claimed to have been abused by Lawson; that Newman had observed Baynard sitting on Lawson's lap in a manner Newman believed to be inappropriate; that Lawson was very physical with his students, often putting his arm around them in the halls; and that Lawson frequently took male students on camping trips at which no other adults were present. Malone argues that all of these facts, except the report from Leckie, are subject to benign interpretation. While this is true, it is also beside the point. A reasonable jury could conclude from the evidence presented that the conduct of which Malone was aware provided her with at least constructive knowledge of an unreasonable risk of constitutional injury to Lawson's students.

Malone next maintains that her actions toward Lawson, although inadequate to prevent or stop the abuse of Baynard, did not evince deliberate indifference to the risk of constitutional injury to Lawson's students. "Deliberate indifference is a very high standard--a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999), cert. denied, 529 U.S. 1067 (2000); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) (explaining that "deliberate indifference describes a state of mind more blameworthy than negligence" but "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result"). Actions that in hindsight are "unfortunate" or even "impru-

_____

[5] Malone argues primarily that she was not deliberately indifferent to a risk of constitutional injury to Baynard. However, Shaw makes clear that the appropriate inquiry is whether Malone was deliberately indifferent to a risk that Lawson was abusing any of his students. See id. (noting that the inquiry is whether supervisor was on notice of conduct that posed a risk of constitutional injury "to citizens like the plaintiff" (emphasis added)).

10

dent" will not suffice. <u>Jones v. Wellham</u>, 104 F.3d 620, 627 (4th Cir. 1997). Indeed, a supervisory official who responds reasonably to a known risk is not deliberately indifferent even if the harm is not averted. <u>See Farmer</u>, 511 U.S. at 844; <u>Doe v. Dallas Ind. Sch. Dist.</u>, 153 F.3d 211, 219 (5th Cir. 1998) (concluding that school official who investigated complaint of sexual abuse was not deliberately indifferent even though official erroneously concluded that complaint was baseless).

Based upon the evidence presented at trial, a rational jury could conclude that Malone was deliberately indifferent to the risk that Lawson was abusing his students, particularly Baynard. Even if Malone's response to the initial report from Leckie in the Spring of 1990 was reasonable, a factfinder could reasonably infer that Malone's failure to respond to mounting evidence of potential misconduct by Lawson exhibited deliberate indifference. In particular, Malone's desultory efforts at "monitoring" Lawson support the verdict.[6] Accordingly, we affirm the denial of Malone's motion for judgment as a matter of law.

III.

On cross-appeal, Baynard contends that the district court erred in granting judgment as a matter of law to Beckhoff, Masem, and the ACSB. With respect to Beckhoff and Masem, Baynard contends that the district court erred in concluding that no rational jury could find deliberate indifference. With respect to the ACSB, Baynard maintains that the district court erred in concluding that the ACSB could not be held vicariously liable under Title IX for the deliberate indifference of Malone. We affirm all three rulings.

_____

[6] Additionally, Malone relies on <u>Jones</u>, 104 F.3d at 627, for the proposition that no rational jury could find a causal link between her deliberate indifference and the constitutional injury suffered by Baynard. We reject Malone's causation argument on the reasoning of the district court. <u>See</u> <u>Baynard</u>, 112 F. Supp. 2d at 529-30.

11

A.

In light of the evidence detailed above, we have little difficulty in concluding that no rational jury could find that Beckhoff was deliberately indifferent to a risk that Lawson was molesting his students. Beckhoff instituted a thorough investigation immediately upon receiving the report from Malone, during which he interviewed Leckie and others who had raised allegations regarding Lawson's past conduct. Beckhoff further instructed Malone, who was responsible for the day-to-day supervision of Lawson, to closely monitor Lawson and report any incidents or complaints. Importantly, Beckhoff never had any knowledge of the lap-sitting incident.[7]

We likewise affirm the grant of judgment as a matter of law to Masem. As superintendent, it was not Masem's responsibility to conduct the investigation himself. Moreover, since Beckhoff's investigation was adequate, Masem did not act improperly in failing to direct Beckhoff to take some other action.

B.

We next turn to Baynard's claim that the district court erred in granting judgment as a matter of law to the ACSB. As is relevant here, Title IX provides that "[n]o person in the United States shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681(a). This prohibition encompasses sexual harassment of a student by a teacher and is enforceable through a judicially implied private right of action for damages against a school district. See Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 75-76 (1992). We conclude that the district court correctly held that no rational jury could find in favor of Baynard on his Title IX claim.

_____

[7] Although Beckhoff was aware that Lawson had been seen walking down the hallway of the school with his arm around Baynard, such practices were common among teachers at that time.

12

1.

Title IX conditions "an offer of funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286 (1998). In Gebser, the Supreme Court explained that the contractual nature of Title IX requires that a funding recipient have notice that it may be liable for a monetary award, i.e., it must actually be aware of the discrimination and fail to remedy it. See id. at 287-88. In other words, a school district may be held liable under Title IX "only for its own misconduct"; the implied damages remedy is available only when "the funding recipient engages in intentional conduct that violates the clear terms of the statute." Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 640, 642 (1999).

In accordance with these considerations, the Supreme Court has expressly rejected the use of "principles of respondeat superior or constructive notice" for imposing liability on a school district under Title IX. Gebser, 524 U.S. at 285. Rather, the Court held in Gebser that "a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [district's] behalf has actual knowledge of discrimination" and is deliberately indifferent to it. Id. at 290. As the Fifth Circuit phrased the test in a pre-Gebser ruling,

> a school district can be liable for teacher-student sexual harassment under Title IX only if a school official who had actual knowledge of the abuse was invested by the school board with the duty to supervise the employee and the power to take action that would end such abuse and failed to do so.

Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 660 (5th Cir. 1997).

The partial dissent asserts that the standard we apply is too strict and that the notice requirement is satisfied by actual notice of a substantial risk of ongoing sexual abuse. Gebser is quite clear, however,

13

that Title IX liability may be imposed only upon a showing that school district officials possessed actual knowledge of the discriminatory conduct in question. See Gebser, 524 U.S. at 285 ("[W]e conclude that it would frustrate the purposes of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of respondeat superior or constructive notice, i.e., without actual notice to a school district official." (internal quotation marks omitted)); id. at 289 (rejecting standard that would allow imposition of liability when "the district had no actual knowledge of the teacher's conduct"); id. at 290 (holding that liability may be imposed only when an appropriate school district official possesses "actual knowledge of discrimination").

To the extent there is any doubt about the nature of the actual notice requirement articulated in Gebser, it is removed by the subsequent opinion of the Court in Davis. In recounting the Gebser holding, the Davis court stated, "In Gebser, we concluded that a recipient of federal education funds may be liable in damages under Title IX where it is deliberately indifferent to known acts of sexual harassment by a teacher." Davis, 526 U.S. at 641 (emphasis added). The Court further explained that in Gebser,

> we rejected the use of agency principles to impute liability to the district for the misconduct of its teachers. Likewise, we declined the invitation to impose liability under what amounted to a negligence standard--holding the district liable for its failure to react to teacher-student harassment of which it knew or should have known. Rather, we concluded that the district could be liable for damages only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge.

Davis, 526 U.S. at 642 (citations omitted) (second emphasis added).

2.

We agree with the district court that no rational jury could find the Gebser standard satisfied here.[8] In the first place, no rational jury
_____
[8] Although the district court and the parties address only the second prong of the Gebser standard--whether knowledge of discrimination was

14

could conclude that Malone--the relevant official for purposes of the ACSB's liability under Title IX--had actual notice that Lawson was abusing one of his students.**9** Although Malone certainly should have been aware of the <u>potential</u> for such abuse, and for this reason was properly held liable under § 1983, there is no evidence in the record to support a conclusion that Malone was <u>in fact</u> aware that a student was being abused.

Secondly, no rational jury could find that Malone was invested with the power to take corrective action on behalf of the ACSB. We agree with the Fifth Circuit that whether a supervisory employee may be viewed as the proxy of the school district depends upon whether the district has delegated to that employee the traditional powers of an employer, <u>e.g.</u>, the authority to hire and terminate employees. <u>See Rosa H.</u>, 106 F.3d at 660. "This inquiry circumscribes those school employees in the chain of command whom the school board has appointed to monitor the conduct of other employees and, as distinguished from reporting to others, remedy the wrongdoing themselves." <u>Id.</u>

We agree with the district court that the principal of a public school in Virginia cannot be considered the functional equivalent of the school district. There is no question that a principal in the Virginia school system possesses substantial authority over the school to which he or she is assigned. For example, a principal must "provide instructional leadership," is responsible for the administration of the school, and must supervise its operations and management. Va. Code

_____

possessed by an individual with authority to act for the school district-- we conclude that the record also supports affirmance on the "actual notice" prong. <u>See Republican Party v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992) (explaining that "we may affirm a judgment for any reason appearing on the record").

**9** We note that a Title IX plaintiff is not required to demonstrate actual knowledge that a particular student was being abused. We believe that the actual notice requirement could have been satisfied, for example, if Malone had had actual knowledge that Lawson was currently abusing one of his students, even without any indication of which student was being abused.

15

Ann. § 22.1-293(B) (Michie 2000). Additionally, the principal is responsible for supervising teachers and evaluating employee performance. See Va. Code Ann. § 22.1-293(C) (Michie 2000); Lentz v. Morris, 372 S.E.2d 608, 610-11 (Va. 1988).

Critically absent from the scope of a principal's authority, however, are the powers that would make a principal the proxy of the school district: the power to hire, fire, transfer, or suspend teachers. In Virginia, those powers are reserved exclusively to the school district; a principal may only make recommendations regarding such matters. See Va. Code Ann. § 22.1-295(A) (Michie 2000) ("The teachers in the public schools of a school division shall be employed and placed in appropriate schools by the school board upon recommendation of the division superintendent." (emphasis added)); id. § 22.1-293(C) ("A principal may submit recommendations to the division superintendent for the appointment, assignment, promotion, transfer and dismissal of all personnel assigned to his supervision." (emphasis added)). Simply put, Virginia has made an explicit policy decision that school principals do not exercise the powers of an employer on behalf of the school district. Because Malone had no independent authority to suspend, reassign, or terminate Lawson, no rational jury could have concluded that her knowledge of ongoing discrimination at Charles Barrett Elementary should be imputed to the ACSB.

IV.

For the reasons set forth above, we conclude that the district court correctly denied Malone's motion for judgment as a matter of law and correctly granted the motions of Beckhoff, Masem, and the ACSB. Accordingly, we affirm.

AFFIRMED

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

I concur in parts I, II, and III.A. of the majority opinion, but I respectfully dissent from part III.B. The jury's verdict against the school board on Title IX should be reinstated because (1) Malone (the

16

principal) had actual knowledge of a substantial risk of sexual abuse to students in her elementary school and (2) she had the authority to institute corrective measures to eliminate the risk.

Title IX provides that "[n]o person . . . shall, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A school board receiving federal funds is liable under Title IX if an appropriate official has "actual knowledge of discrimination in the [board's] programs and fails adequately to respond. . . . [T]he [inadequate] response must amount to deliberate indifference to discrimination." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998).

I.

The majority affirms the grant of judgment as a matter of law to the school board, holding that under Gebser "Title IX liability may be imposed only upon a showing that school district officials possessed actual knowledge of the discriminatory conduct in question." Ante at 14. The majority explains that "the actual notice requirement [can be] satisfied, for example, if [the appropriate official] had had actual knowledge that [the teacher] was currently abusing one of his students, even without any indication of which student was being abused." Ante at 15 n.9. The explanation is a step in the right direction, but it still means that the actual notice standard is satisfied only if the school board official was aware of current sexual abuse to someone in the student body (not necessarily the eventual plaintiff). This is wrong, I respectfully suggest, because Gebser does not require that the appropriate official have actual knowledge of current abuse. Rather, Gebser leaves room for an actual notice standard that requires the appropriate official to have actual knowledge of at least a substantial risk of sexual abuse (or discrimination).

Gebser held that a complaint by parents that a teacher "had made inappropriate [sexually suggestive] comments during class . . . was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." Gebser, 524 U.S. at 291. Thus, while Gebser makes clear that the actual notice standard requires more than a complaint about inappropriate

17

remarks, the case does not definitively establish the boundaries of actual notice. By insisting that actual notice cannot be satisfied by anything less than actual knowledge of current abuse, the majority's new standard "set[s] the bar [too] high." Doe v. Sch. Admin. Dist. No. 19, 66 F. Supp. 2d 57, 63 (D. Me. 1999).* Under the majority's standard a school board will escape liability even if an appropriate official knew that a teacher was engaging in behavior that raised warning flags of substantial risk as long as the official did not actually know that the teacher was abusing a student. The majority's standard will also let a school board off the hook if its official knew that a teacher had abused a student in the past as long as the official did not know of any current abuse.

These results, brought about by a notice standard that is too restrictive, are inconsistent with the objectives of Title IX and with the actual notice and deliberate indifference theory of liability recognized by the Supreme Court. First, one of Title IX's principal objectives is to provide effective protection against discriminatory or abusive practices in schools that receive federal funds. See Gebser, 524 U.S. at 286. Under Title IX a school board has "a duty not to permit teacher-student [sexual abuse] in its schools." Davis v. Monroe County Bd. of Educ., 526 U.S. at 643 (internal quotations omitted), and this duty is imposed "to induce school boards to adopt and enforce practices that will minimize the danger that vulnerable students will be exposed to such [abuse]," Gebser, 524 U.S. at 300 (Stevens, J., dissenting). The majority's notice standard actively undermines Title IX's objectives because it discourages efforts to identify situations of potential abuse. The appropriate official can simply wait until she gains actual knowledge of current abuse. In short, the majority's standard does little to

_____

*The majority contends that Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999), removes any doubt that the actual notice standard requires actual knowledge of current misconduct. See ante at 14. I disagree. Davis's primary point is that a school board may be liable under Title IX for student-on-student harassment. And while Davis reaffirms Gebser's rejection of the constructive notice and respondeat superior theories of liability, Davis did not clarify what constitutes actual notice because notice was not at issue. Rather, Davis held that a complaint alleging that a school principal had actual knowledge of student-on-student harassment stated a claim.

18

prevent sexual abuse from occurring in the first place, even though prevention is the best way to further Title IX's goal of nondiscrimination. Second, the majority's notice standard -- requiring actual knowledge of current abuse -- is too restrictive to afford the full measure of protection intended under Gebser's actual notice and deliberate indifference theory of liability. According to the Supreme Court, "If a funding recipient does not engage in [abuse] directly, it may not be liable for damages unless its deliberate indifference `subject[s]' its students to [abuse]. That is, the deliberate indifference must, at a minimum, `cause [students] to undergo'[abuse] or `make them liable or vulnerable' to it." Davis, 526 U.S. at 644-45 (second and fourth alterations in original) (emphasis added) (quoting Random House Dictionary of the English Language 1415 (1966)). Thus, if a board is liable when its official's deliberate indifference makes students vulnerable to abuse, the official's knowledge of that vulnerability (or substantial risk) surely satisfies the actual notice standard. Under the majority's theory, however, liability is triggered only if the official had knowledge of actual abuse.

The proper boundary for what constitutes actual notice lies somewhere between the one adopted by the majority (actual knowledge of current sexual abuse) and the one rejected by Gebser (actual knowledge of sexually suggestive comments in class). I am convinced that the actual notice requirement is met when an appropriate official has actual knowledge of a substantial risk of abuse. An appropriate official has actual knowledge of a substantial risk if she knows of facts indicating a substantial risk and she subjectively believes that the facts signal such a risk. See Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 659 (5th Cir. 1997). This is not a constructive notice or respondeat superior theory, which would impose liability even if the appropriate official had no actual knowledge of anything. Thus, the standard I propose is consistent with Gebser. The Gebser Court was, of course, unwilling to impose liability on school districts that lack any notice of discrimination. "[A] central purpose of requiring notice of the violation . . . is to avoid diverting education funding from beneficial uses where a recipient was unaware of discrimination in its programs." Gebser, 524 U.S. at 289. Actual knowledge of a substantial risk of abuse, however, provides fair and sufficient warning to a school board that it faces potential liability.

19

My interpretation of what satisfies <u>Gebser</u>'s actual notice require-
ment is consistent with that of district courts that have confronted this
question. <u>See, e.g.</u>, <u>Gordon v. Ottumwa Cmty. Sch. Dist.</u>, 115 F. Supp.
2d 1077, 1082 (S.D. Iowa 2000) (actual notice "does not set the bar
so high that a school district is not put on notice until it receives a
clearly credible report of sexual abuse from the plaintiff-student. At
some point . . . a supervisory school official knows. . . that a school
employee is a substantial risk to sexually abuse children.") (internal
citations and quotations omitted); <u>Massey v. Akron City Bd. of Educ.</u>,
82 F. Supp. 2d 735, 744 (N.D. Ohio 2000) ("For actual notice to exist,
an agent of the school must be aware of facts that indicate a likeli-
hood of discrimination."); <u>Frederick v. Simpson College</u>, 149 F. Supp.
2d 826, 838 (S.D. Iowa 2001) (actual notice requires "actual notice
. . . that [the teacher] was at risk of sexually harassing a student.").

The evidence in this case supports the conclusion that Malone (the
principal) actually knew that Lawson (the teacher) posed a substantial
risk to the students of Charles Barrett Elementary School. Leckie, one
of Lawson's former student-victims, told Malone that he had been
sexually molested by Lawson. Leckie warned Malone to watch out
for certain telltale signs, such as whether Lawson was spending extra
time with a particular student or giving him rides home. Leckie's
mother also talked to Malone and confirmed her son's story. Two
other members of the community and a teacher informed Malone that
Lawson was a pedophile who had abused students. Malone herself
witnessed excessive physical contact between Baynard and Lawson in
the hallway at school. Specifically, Malone noticed Baynard "con-
stantly hanging onto" Lawson, and Malone recognized that this
behavior was "really inappropriate for a sixth grade student." Finally,
Malone was aware of an incident of particularly flagrant behavior
involving Lawson and Baynard. Newman, the school librarian,
walked into Lawson's classroom one morning before classes began
and saw the following: Baynard was sitting on Lawson's lap, Lawson
had his arm around Baynard, their faces were almost touching, and
Lawson was whispering to Baynard. When Lawson and Baynard saw
Newman, an expression of shock crossed their faces. Lawson jumped
up immediately, dumping Baynard on the floor. Newman "quickly
turned" and walked out of the room. She was upset at what she had
seen because "[i]t just didn't look right" and "was inappropriate."
Newman "didn't think this is anything you would do with a sixth

20

grade boy sitting on your lap." Newman promptly reported everything she had seen to Malone. This evidence is sufficient to establish "actual notice" under Title IX because the jury could rationally conclude that Malone knew the facts indicating that Lawson was a substantial risk and that she personally understood that risk.

II.

For a school board to be liable under Title IX, there must be actual notice to an "appropriate" official, that is, an official "who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [school board's] behalf." <u>Gebser</u>, 524 U.S. at 290. Even though Malone, as school principal, had supervisory authority over Lawson, the majority concludes that Malone is not an appropriate official because her authority over personnel matters was limited to making recommendations and she "had no independent authority to suspend, reassign, or terminate Lawson." <u>Ante</u> at 16. I disagree.

The principal is the highest ranking school official present at the school every day, and she performs many functions on behalf of the school board. <u>Cf. Banks v. Sellers</u>, 294 S.E.2d 862, 865 (Va. 1982) (referring to the principal as "essentially a counterpart of the [division] superintendent"); <u>Pleasants v. Commonwealth</u>, 203 S.E.2d 114, 116 (Va. 1974) (calling the principal "the duly authorized representative of the school board"). She is "responsible for the administration of and shall supervise the operation and management of the school or schools and property to which [s]he has been assigned." Va. Code Ann. § 22.1-293(B). <u>See also Banks</u>, 294 S.E.2d at 865 (noting that the principal "performs a large number of discretional and managerial functions in the school"). The local school board "exercises control and direction over [a teacher] through the school principal." <u>Lentz v. Morris</u>, 372 S.E.2d 608, 610 (Va. 1988).

Virginia statutes and regulations assign to the principal the first line of responsibility for ensuring that the students in her school are safe, particularly from sexual abuse at the hands of their teachers. <u>Cf. Pleasants</u>, 203 S.E.2d at 116 (noting that the principal is required to "look out for the safety of the students"). Other school employees and members of the community are expected to report instances of sexual

21

abuse to the principal. See Va. Code Ann. § 22.1-279.3:1(A) (designating principal as official to receive reports of sexual assault in school); see also Alexandria City Pub. Sch., Child Abuse and Neglect, Regulation File 2107-R (July 15, 1981) (directing teachers to notify principal of suspected child abuse); Alexandria City Pub. Sch., Health and Safety of Pupils, Policy File 2104 (Mar. 19, 1986) (directing teachers to notify principal of classroom conditions that are dangerous to children). The principal must then report these incidents to the division superintendent, the student's parents, and the police. See Va. Code Ann. § 22.1-279.3:1(C), (D); 8 Va. Admin. Code § 20-560-10. In this case six different people reported to Malone, under the assumption that she would implement the necessary measures to make sure Lawson was no longer a threat to the children. Because Malone was the supervisor of the school and the official designated to receive complaints about sexual assaults, the school board should not be able to avoid liability for Malone's deliberate indifference to a known risk of teacher-on-student sexual abuse.

By emphasizing Malone's lack of authority to suspend, terminate, or reassign Lawson, the majority has created an overly narrow concept of an official who has authority "to institute corrective measures." Malone had the duty and authority to implement various measures that would have contributed to preventing or stopping Lawson's abuse of Baynard. For instance, as Lawson's supervisor, Malone could have confronted Lawson with the reports she had received and ordered him to stop the inappropriate behavior she personally witnessed. See Warren v. Reading Sch. Dist., 82 F. Supp. 2d 395, 399-400 (E.D. Pa. 2000) (holding that principal is an official with authority to institute corrective measures because she has supervisory authority over teachers and the power to question teachers about suspicious behavior). In addition, Malone could have given the division superintendent and the police a prompt and complete report of Lawson's abusive behavior. See id. at 399 (concluding that the principal's higher duty to report to appropriate authorities is a corrective measure); see also Booker v. City of Boston, No. CIV.A.97-CV-12534MEL, 2000 WL 1868180, at *3 (D. Mass. Dec. 12, 2000) (holding that principal was an official with the authority to end the sexual abuse because he "not only had the authority but the obligation to notify [the Department of Social Services]" (emphasis in original)). Other corrective measures that Malone could have taken include noti-

22

fying Baynard's parents and properly monitoring Lawson according to the instructions of Beckhoff, the personnel director. The appropriate official's authority to "institute corrective measures" does not have to include the authority to suspend or fire. As long as the official possesses the ability and the duty to take meaningful steps toward stopping the abuse, the official's deliberate indifference should translate into school board liability under Title IX. See Morlock v. W. Cent. Educ. Dist., 46 F. Supp. 2d 892, 911 (D. Minn. 1999) (holding that "as the acting principal of the [alternative school program], the school's sexual harassment coordinator and [the harassing teacher's] superior, Fish had the power and the official responsibility to begin the process of addressing plaintiff's complaint" of sexual harassment). Malone had the authority to initiate steps to prevent or end Lawson's abuse of Baynard.

Under the majority's approach, it appears that the class of appropriate officials will be limited, at least in Virginia, to school board members because only the school board has the power to suspend or terminate a teacher. See 8 Va. Admin. Code § 20-90-70. As one court has pointed out, defining the class of appropriate officials so narrowly means that "a school district would virtually never face penalties for sexual abuse of students unless school board members themselves intended the harm. By the same token, victims of abuse would virtually never be able to recover, especially in large school districts, in which school board members have little contact with the day-to-day interactions between teachers and students." Rosa H., 106 F.3d at 659. Gebser does not require such a narrow construction. Again, an appropriate official is simply one who "has authority to address the alleged discrimination and to institute corrective measures." Gebser, 524 U.S. at 290. Malone, as principal, was in a position to take corrective action.

III.

In sum, the record supports the conclusion that Malone had actual knowledge that Lawson posed a serious risk and that she had the authority (but failed) to institute corrective measures to address this risk. That is sufficient under Gebser to hold the school board liable under Title IX. I would therefore reverse the district court's order granting the school board's motion for judgment as a matter of law.

23